**Opinion issued August 30, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00174-CV

———————————

## TIM WOOTERS, Appellant

## V.

## UNITECH INTERNATIONAL, INC., Appellee

---

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Case No. 2012-10494**

---

## O P I N I O N

In this appeal from a judgment for conspiracy to breach a fiduciary duty, we determine whether sufficient evidence supports a finding that a non-employee conspired to aid an employee's breach of fiduciary duty to his employer. Unitech International, Inc. sued two former employees when it discovered that those

employees had stolen Unitech's trade secrets in preparation for launching a competing company. Unitech fired the employees, Chris Kutach and Jason Pennington. During its investigation, Unitech learned that Kutach had asked Tim Wooters, who was not a Unitech employee, to join Kutach and Pennington in forming the new company. Unitech sued Wooters too, alleging that Wooters had conspired with Kutach and Pennington to breach their fiduciary duties to Unitech, to steal Unitech's trade secrets, and to unlawfully convert Unitech's property.

A jury found in favor of Wooters on the latter two claims, determining that Wooters did not conspire to steal or to convert Unitech's property. But it found that Wooters had conspired with Kutach and Pennington to breach their fiduciary duties to Unitech. The jury also found Kutach and Pennington liable under all three theories and awarded damages.

Wooters appeals, contending that no evidence supports the jury's finding that he conspired to breach fiduciary duties owed by Kutach and Pennington to Unitech and no evidence supports the jury's damages award. Because no evidence supports the finding that Wooters conspired to breach fiduciary duties owed to Unitech, we reverse the finding of liability against Wooters and render judgment that Unitech take nothing against him.

## BACKGROUND

Unitech is a company that sells products and services to customers in the offshore and subsea oil and gas production business. It was founded in 1984 in Norway by Bernt Hellesøe. Unitech opened a Houston office in 1995. Bernt Hellesøe and his son, John Hellesøe, lead the Houston operation.

Unitech manufactures "flying" and "umbilical" leads, which are lines that carry hydraulic signals between the sea bottom and the ocean surface, and "stab plates," which connect with the leads and attach to the wellhead on the ocean floor. Unitech continually develops new designs to improve its products' performance and durability. Its designs are valuable, proprietary, and confidential property. Unitech typically holds its designs under lock and key in Bernt Hellesøe's office.

*Kutach and Pennington's employment*

In October 2011, Chris Kutach joined Unitech Umbilical Services, Inc., an affiliated company, as a service manager. Kutach signed a noncompetition agreement with Unitech. Kutach's agreement contained the following clause:

> If [Kutach] leaves or is dismissed by UNITECH GROUP,
> [he] is under obligation to the best of his ability not to be
> employed or obtain livelihood from activities in
> competition with UNITECH GROUP.

Among other duties, Kutach served as a project manager for a transaction known as the "Saipem Project," a subsea oil and gas development project near China. As part of the project, Unitech planned to provide 11 flying leads.

Jason Pennington began working for Unitech as a sales manager in 2010. As sales manager, Pennington was responsible for closing Unitech's side of the Saipem transaction. Pennington also signed a noncompetition agreement as part of his employment at Unitech.

*Kutach plans a competing subsea services company*

Kutach had longtime thoughts of developing a subsea services company. During the 1990's, while Kutach was employed with Parker Cabett Subsea, he shared these ideas with Tim Wooters, who was Kutach's supervisor and part owner of that company. Wooters was an engineering manager with technical expertise in the industry. Kutach also shared his idea with another Parker co-worker, Jason Collins. Collins also eventually went to work for Unitech.

After leaving Parker Cabett, Kutach maintained contact with Wooters and periodically sent him industry materials. Wooters eventually retired from Parker Cabett.

*Kutach and Pennington plan to form a competing company*

While working at Unitech, Kutach discussed the possibility of forming a subsea services company with Pennington. In October 2011, Kutach met with Pennington and Collins at a Tex-Mex restaurant, where they discussed Kutach's plan to form a company called Infinity Subsea. They discussed a possible client

relationship with Fjell, a competitor of Unitech that, like Unitech, is also based in Norway. Fjell had recently entered the subsea market.

A former Unitech employee, Sonia van Uden, had left Unitech for Fjell. Van Uden was in charge of Fjell's new subsea products division. Pennington had maintained contact with van Uden since her departure from Unitech earlier in 2011.

Following the October meeting, Pennington registered an Internet domain name for a company to be called Infinity Subsea. With input from Kutach and Collins, Pennington began to draft a business plan for the company.

In November 2011, Bernt Hellesøe discovered that someone had tampered with his Houston office door while he was out of town. Hellesøe hired a private investigator, John Moritz, to look into the matter. Moritz installed audio and video surveillance equipment throughout the office. He captured recordings of Kutach discussing Unitech's trade secrets and Kutach's plan to form a competing company.

On November 29, 2011, Kutach texted Pennington, "Get the company started, I'm ready to quit." Pennington responded, "Let's meet your guys and keep formulating the plan. I have a business plan outline for us to review."

During the first full week of December, Kutach and Pennington traveled to Paris to attend a meeting on Unitech's Saipem Project. Unitech had approved Kutach's travel to Paris for the meeting. Pennington told Unitech that he was taking a vacation day and accompanied Kutach to Paris. Pennington then accompanied

Kutach to the Saipem Project meeting and, without Unitech's authorization, signed a contract on behalf of Unitech to provide products for an amount that was 40 percent less than the market price.

While Kutach and Pennington were in Paris, they also met with van Uden. At the meeting, van Uden showed Kutach and Pennington a Fjell presentation that included Fjell's new subsea product line. Kutach recognized that some of the product designs appeared to be "strikingly similar" to Unitech's products. Kutach thought that Fjell "would have to have taken information to be able to replicate the plates as closely as they did."

When Kutach and Pennington returned from Paris, they did not disclose the meeting with van Uden to Unitech. Unitech later discovered that, before the meeting with van Uden, Pennington already was in possession of documents containing Unitech's product designs. Pennington had no legitimate business reason for having those confidential documents.

By December 10, Kutach began communicating with his industry contacts—which included some of Unitech's customers—to solicit investments for the new venture.

Kutach and Pennington continued developing their business plan, unaware of Hellesøe's private investigation into their conduct. On December 15, Kutach forwarded a copy of Kutach's resume to Pennington for inclusion in the business

plan, and Pennington forwarded the draft business plan to Kutach the same day. The draft did not mention Wooters, but it contained a job description tailored to the technical skills that Wooters possessed. Neither Kutach nor Pennington had yet approached Wooters about involvement in the new company.

*Wooters's involvement with the parties*

During either late November or mid-December, Kutach invited Wooters to a meeting at a Brazilian restaurant. Pennington and Collins attended this meeting. This meeting was the first time that Kutach "started talking about the possibilities of opening up a business" in Wooters's presence.

On December 15, Kutach telephoned Wooters with the stated purpose of recruiting him to work for Unitech. In reality, Kutach wanted Wooters to be involved in Kutach's new company because Wooters had knowledge and expertise in the industry, and Wooters held patents on some industry products. Kutach believed that Wooters's technical knowledge would complement the sales and project management experience that he, Pennington, and Collins had.

On December 19, Kutach contacted Wooters again. Still under the guise of recruiting Wooters to work for Unitech, Kutach asked for Wooters's resume so that he could forward it to John Hellesøe at Unitech. Wooters sent the resume to Kutach.

On December 27, Kutach called Wooters and continued to discuss getting Wooters a job at Unitech. The same day, Wooters emailed Bernt Hellesøe inquiring

about working for Unitech because he had heard of Unitech's possible plans for expansion of capabilities, including production of flying leads, in the United States. He continued:

> If that is certain, I would be interested in talking with you about it as I have become bored in the retired life and really need something to do!!! I have two patents relating to flying leads and composite riser cables that need to be exploited. I think we should get together and discuss if there is something I could do with this project as I feel I could help you quickly enter this market.

This email was the first that Bernt Hellesøe heard about Wooters's interest in joining Unitech. Bernt Hellesøe denied having authorized Kutach to recruit Wooters. John Hellesøe did not testify at the trial.

On December 29, Kutach obtained Fjell's marketing materials, which were available on the internet, and forwarded some of them to Wooters. Also that day, Bernt Hellesøe sent Wooters a brief reply email, stating "Tim, I will call you tomorrow. It got to[o] late here."

On January 7, Kutach verified the spelling of Wooters's name in an email to Liane Wilde, a Unitech employee, and stated that he would ask Wooters to send to Kutach "all his credentials and experiences."

On January 10, Wooters had a phone conversation with Kutach. Following the call, Kutach sent Pennington the following text message:

> Tim is furious with Bernt, Bernt never called him and he is fixing to email Bernt to take his patents off [Unitech's] website.

Tim said if we can build an alliance with Fjell he would be willing to share patents and compete against Unitech and others . . . .  Let's chat later on a path forward . . . . we need to position ourselves for the subsea tieback or OTC as a goal for our company.

On January 14, Kutach texted Pennington:  "Infinity we unite! I am so ready!"

On January 15, Wooters sent a second and final email to Bernt Hellesøe, which read:

Have been waiting around here at the house all weekend waiting for your call back to no avail.

. . . .

I am not completely "retired" from the subsea business after 35 years, and still stay in contact with a lot of old contacts.  I thought I would give you a call to see i[f] I would get involved with this new venture of yours. . . .  I was trying to offer you a couple items of technology with a good will intent of giving you another route to expand your business.  But that is obviously not going to happen.  I think you have made a fatal mistake here . . . but that is your business.

. . . .

As I ventured into the section regarding flying leads [on Unitech's website], lo[] and behold I found . . . my slotted core cable designs I showed you years ago. . . .  [C]an you explain when I granted you permission to use and advertise this technology[?]  It is covered under one of the two U.S. Patents that I was offering to you in my [prior] email . . . .  I think it is best at this point that you remove this data from your website as I am in the process of testing a prototype slotted core HFL as depicted.

. . . .

Please be kind enough to acknowledge receipt of this e-mail and I will leave you alone.

Kutach testified that he attached the resume that Wooters provided to the draft business plan "after he was unemployed" by Unitech.

*Results of the private investigation*

Moritz's private investigation produced evidence of Kutach and Pennington's plans to compete with Unitech, conduct which violated their noncompetition agreements. Using a camera concealed in Kutach's office, Moritz obtained undated video of Kutach speaking with a Unitech welder about possibly starting up another company. Based on these results, Unitech fired Kutach and Pennington on January 17. Law enforcement personnel escorted them out of Unitech's office and required them to leave their personal effects and company cellphones and computers in place. Moritz conducted forensic analyses of the data on the company computers and cell phones issued to Kutach and Pennington. He recovered files, documents, and photos containing company trade secrets that they were not authorized to have.

Moritz then formulated a sting operation. He solicited a prominent businessman in the energy industry to pose as a potential investor for Infinity Subsea. Unitech employee John Hanna, who knew about Kutach and Pennington's activities, informed Kutach and Pennington that he had located a potential investor. A meeting was arranged to meet with the investor on January 21 in Houston.

Meanwhile, on January 19, two days after they were fired, Kutach and Pennington met with Wooters at a steak restaurant. Collins did not attend this

meeting. During this meeting Wooters for the first time saw the current Infinity Subsea business plan. The group discussed each of their roles in the business. Wooters was to be the company's designer. Kutach and Pennington discussed the prospect that Fjell Industries would supply Infinity Subsea with stab plates and the company would obtain umbilical leads from other suppliers.

Kutach, Pennington, Collins, and Wooters were present at the January 21st meeting with the purported investor. Unbeknownst to them, the meeting room was equipped for surveillance and the meeting was recorded. They made a presentation of their business plan. In February, Kutach emailed van Uden that he had unfriended her on Facebook and "erased everything" he had with Fjell on it "so in case something happened, we would be free and clear."

*Course of proceedings*

Armed with evidence of the meeting, Unitech sued Kutach, Pennington, Collins, Wooters, and others, seeking injunctive relief and monetary damages, including the development costs of its trade secrets, damages for signing the below-market-value agreement with Saipem, the salaries that Unitech had paid to Kutach and Pennington, Unitech's costs to replace and retrain its employees, and Unitech's investigation costs and expenses.

Unitech nonsuited Collins as a defendant during the trial in exchange for his agreement to an injunction against him barring him from competing with Unitech or using its confidential information.

The jury found that Kutach and Pennington had breached their fiduciary duties to Unitech. It further found that Wooters was "part of a conspiracy to breach the fiduciary duties owed by Pennington or Kutach to Unitech." It found that Wooters was not part of a conspiracy to commit theft or to convert Unitech's property.

Based on the conspiracy to breach fiduciary duty finding, the trial court entered judgment against Wooters finding him jointly and severally liable with Kutach and Pennington for breach of fiduciary duty and awarded $7,344,049, plus interest, and $10,000 in exemplary damages. The judgment defined these awards as: $5 million in development costs of Unitech's trade secrets, $1,800,000 in damages for signing the below-market-value contract with Saipem, $229,049 in salaries and bonuses that Unitech had paid to Kutach and Pennington, $250,000 for Unitech's costs to replace and retrain these employee positions, and $65,000 for Unitech's investigation costs and expenses. The trial court also entered a permanent injunction against all of the defendants, barring any use or disclosure of Unitech's trade secrets, solicitation of Unitech customers, and prohibiting the destruction of any relevant documents. Wooters moved for judgment notwithstanding the verdict or for a new trial, contending that there was no evidence that Wooters had engaged

in an unlawful conspiracy and no evidence of damages. The trial court denied the motion.

## DISCUSSION

Wooters is the only party who appeals the trial court's judgment. He contends that the evidence is legally insufficient to support the finding that he is jointly and severally liable as a co-conspirator for Kutach and Pennington's breaches of fiduciary duty.

## I.     Standard of Review

We sustain a legal-sufficiency or "no-evidence" challenge if the record shows (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, we consider the evidence in a light most favorable to the verdict, and we indulge every reasonable inference that supports the verdict. *Id.* at 822. If more than a scintilla of evidence supports the challenged finding, then we uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). Thus, if the evidence at trial would enable reasonable and fair-minded people to differ in their

conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

For conspiracy claims, the proof is often based on circumstantial evidence. *See Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968). In reviewing circumstantial evidence, we review the totality of the known circumstances. *Felker v. Petrolon, Inc.*, 929 S.W.2d 460, 464 (Tex. App.—Houston [1st Dist.] 1996, writ denied), *quoted in Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex. 2001). A conspiracy finding depends on the reasonableness of the inferences drawn from these circumstances, based on deduction from proven facts. *Lozano*, 52 S.W.3d at 149 (citing *Joske v. Irvine*, 44 S.W. 1059, 1064 (Tex. 1898)). The Texas Supreme Court has concluded that "[a]n inference is not reasonable if it is susceptible to multiple, equally probable inferences, requiring the factfinder to guess in order to reach a conclusion." *Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015). Nor is an inference reasonable if its sole support consists of other inferences or suspicion. *See id.* (observing that "some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence"); *City of Keller*, 168 S.W.3d at 813 (explaining that in claims or defenses supported only by circumstantial evidence, evidence is legally insufficient if jurors would have to guess whether vital fact exists); *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003) (explaining that an inference stacked on other

14

inferences is legally insufficient evidence); *Peine v. HIT Servs., L.P.*, 479 S.W.3d 445, 452–53 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (rejecting plaintiff's proposed interpretation of email correspondence because it would require reliance on multiple inferences to draw conclusion that plaintiff was fired for sole reason that he refused to perform illegal act).

## II.    Applicable Law

Civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). The essential elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996); *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995).

Because a defendant's liability depends on participation in an underlying tort for which the plaintiff seeks to hold the defendant liable, conspiracy is a derivative tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). "The 'gist' of a civil conspiracy is the injury that is intended to be caused." *Triplex Commc'ns, Inc.*, 900 S.W.2d at 720 (citing *Nortex Oil & Gas*, 435 S.W.2d at 856). Proof of a joint intent to engage in the conduct that resulted in the injury, without more, does not establish

15

a cause of action for civil conspiracy. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (quoting *Triplex Commc'ns*, S.W.2d at 719). Civil conspiracy instead requires the specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Id.*; *A.H. Belo Corp. v. Corcoran*, 52 S.W.3d 375, 384 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). "[T]he parties must be aware of the harm or wrongful conduct at the inception of the agreement." *Triplex Commc'ns*, 900 S.W.2d at 719.

Because Unitech's conspiracy claim against Wooters is based on the underlying wrongful conduct of breach of a fiduciary duty by an employee against an employer, we consider the law that defines the parameters of that duty. An employee has a duty to act primarily for the benefit of his employer in matters connected with his employment. *Daniel v. Falcon Interest Realty Corp.* 190 S.W.3d 177, 185 (Tex. App.—Houston [1st Dist.] 2005, no pet.). An employee may not (1) appropriate the company's trade secrets; (2) solicit the former employer's customers while still working for his employer; (3) solicit the departure of other employees while still working for his employer; or (4) carry away confidential information. *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 512 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

Texas has recognized a cause of action for conspiracy to breach a fiduciary duty in transactions in which a third party knowingly participates in an employee's

16

breach of fiduciary duty during his employment and the third party improperly benefits from it. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W. 509, 514 (Tex. 1942) (holding third-party competitor liable for knowing participation in breach of fiduciary duty when it paid employee commission to obtain technology owned by employer at favorable price); *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 450 (Tex. App.—Eastland 2006, pet. denied) (holding wife liable for knowing participation in employee's embezzlement where funds were placed in joint account and wife benefitted from stolen funds).

But the basis for liability for breach of an employee's duty is limited: it is "tempered by society's legitimate interest in encouraging competition." *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201 (Tex. 2002). Thus, "'[a]n at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed'" and may secretly do so with other employees, without disclosing his plans to his employer. *Id.* (quoting *Augat v. Aegis, Inc.*, 565 N.E.2d 415, 419 (Mass. 1991)). An employee also may use his general skills and knowledge obtained through employment to compete with the former employer. *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Thus, an employee's duty to his employer does not require an employee to disclose his plans to compete; he may secretly join with other

employees to plan a competing company without violating any duty to his employer. *Abetter Trucking Co.*, 113 S.W.3d at 511.

## III.    Analysis

While Kutach and Pennington's formulation of plans to create a competing company may have violated contractual duties that they had assumed by signing noncompetition agreements, they did not violate their fiduciary duty merely by formulating plans to compete. *See Johnson*, 73 S.W.3d at 201; *see also Navigant Consulting, Inc. v. Wilkinson,* 508 F.3d 277, 284 (5th Cir. 2007) ("[U]nder Texas law, an at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed. Even the existence of a fiduciary relationship between employee and employer does not preclude the fiduciary from making preparations for a future competing business venture; nor do such preparations necessarily constitute a breach of fiduciary duties.") (quotation marks and citations omitted)); *Ameristar Jet Charter, Inc. v. Cobbs*, 184 S.W.3d 369, 374 (Tex. App.—Dallas 2006, no pet.) (holding there was no breach of fiduciary duty when employee formed competing business while employed but did not compete with employer until he resigned); *Abetter Trucking Co.*, 113 S.W.3d at 510 (explaining that employee secretly join with other employees to make plans for forming competing business without violating any duty to employer).

Wooters was not a party to Kutach and Pennington's employment agreements, nor was he employed by Unitech; as contractual obligations to which Wooters had no connection, those agreements cannot serve as the basis for determining whether Wooters engaged in a conspiracy to breach fiduciary duty under the common law. *See id.* Rather, some evidence must show that Wooters knowingly participated in an unlawful breach of duty beyond lawful preparation to compete. Thus, we consider whether a reasonable jury could find that Wooters, a non-employee, agreed with Kutach and Pennington that they would breach the fiduciary duty they owed to Unitech and knowingly participated in that breach to his benefit in connection with the steps that they took toward realizing Infinity Subsea as a competing company. *See Triplex Commc'ns*, 900 S.W.2d at 719. In undertaking this analysis, we are mindful that the jury rejected any finding that Wooters had participated in a theft or conversion of Unitech's trade secrets or confidential information.

Unitech points to the following evidence that Kutach and Pennington breached their fiduciary duties:

- Without authorization, Kutach and Pennington possessed confidential and proprietary design information about products that Unitech was developing;

- While still employed by Unitech, Kutach solicited investments for Infinity Subsea from Unitech's customers;

- Bernt Hellesøe's Houston office was broken into within a short time after Unitech hired Kutach;

19

- Kutach and Pennington were in communication with Fjell, a Unitech competitor, and while on Unitech business, had a secret meeting with a Fjell employee who had once worked for Unitech;

- Fjell branched out into the subsea industry and, without prior subsea experience, manufactured subsea products that were "strikingly similar" to the ones that Unitech had been developing that reflect unauthorized access to Unitech's confidential and proprietary designs;

- Pennington signed Unitech's Saipem Project contract without receiving the necessary permission from Bernt Hellesøe and for a price that would bind Unitech to provide the flying leads at a significant loss;

- Both Kutach and Pennington concealed information from Unitech about their discussions and meetings with Fjell, and Pennington went to Europe to sign the Saipem Project contract without informing Unitech of his plans; and

- Kutach and Pennington discussed Infinity Subsea with other Unitech employees, including the possibility that they could join the company when it was operational.

No evidence in the record establishes that Wooters took part in these actions, most of which occurred before Kutach approached Wooters about joining a company.

In connecting Wooters as a conspirator, Unitech first observes that Kutach eventually attached Wooters's resume to the business plan and notes that, in the eventual plan submitted at the investor's meeting, Wooters is listed as a "principal

owner/investor." The evidence of Wooters's participation in a plan to form Infinity Subsea and solicitation of investors toward that effort, without more, cannot support the conspiracy finding against Wooters, as it is evidence of plans to compete, which is not unlawful. The proposed business plan submitted to Wooters before the investor meeting does not reveal Unitech's confidential information or demonstrate an agreement by Wooters to participate in Kutach and Pennington's breaches of fiduciary duty.

Unitech next points to the text message from Kutach to Pennington that, "Tim [Wooters] said if we can build an alliance with Fjell, he would be willing to compete against Unitech and others. Let's chat later on a path forward." The message does not indicate that Wooters had knowledge of Kutach and Pennington's conduct in breaching their fiduciary duties. It is as indicative of future plans to compete as it is of current competition; as such, it is not evidence of knowing participation in a conspiracy to breach fiduciary duties.

Unitech argues that Wooters's receipt of the Fjell brochure that Kutach forwarded to Wooters during Kutach's employment supports an inference that Wooters was aware that Fjell improperly had acquired Unitech's designs and that Wooters knew about their origin. But it was undisputed at trial that the brochure was publicly available on Fjell's website. No witness testified that Wooters knowingly participated in obtaining confidential product designs from Unitech, used

21

them, or knew that they had been stolen. The jury found that Wooters had not conspired to steal or convert Unitech's trade secrets, a term that the charge broadly defined as including, among other categories, lists of actual or potential customers and any information with potential economic value not readily ascertainable by proper means. Similarly, nothing in the record shows that Wooters possessed knowledge of and participated in Pennington and Kutach's solicitations of employment of any Unitech employees. Infinity Subsea did not hire any Unitech employee.

We also reject Unitech's contention that Kutach and Pennington's company cell phone records, showing that they had calls and texts to and from Wooters while they were still employed at Unitech, support the conspiracy finding. Wooters testified that he had a practice of deleting all text messages immediately after receiving them. Even if the jury disbelieved Wooters's explanation for deleting the text exchanges, any adverse inference would result solely from speculation. Unitech did not assert spoliation or request a sanction from the trial court on this issue. *See Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 20–21 (Tex. 2014).

The phone records do not support an inference of knowing participation in a breach of fiduciary duty as more likely than an inference that the discussions revolved around formulating future business plans. The latter does not denote conspiracy to participate in tortious conduct. *See Bluebonnet Petroleum, Inc. v.*

22

*Kolkhorst Petroleum Co.*, No. 14-07-00380-CV, 2009 WL 4527709, at \*10 (Tex. App.—Houston [14th Dist.] Oct. 9, 2008, pet. denied) (mem. op.) (rejecting evidence of phone calls between employee and competitor on day of client meeting as evidence of unlawful conspiracy to breach fiduciary duty).

Finally, Unitech adduced no evidence that Wooters benefitted from Kutach and Pennington's breaches of duty. *See Kinzbach Tool,* 160 S.W.2d at 568–69 (finding evidence of a conspiracy where competing company secretly paid competitor's employee commission and obtained use of technology at favorable price); *Paschal,* 215 S.W.3d at 442 (evidence of embezzled funds placed in joint account and used to purchase five life insurance policies with wife as beneficiary sufficient to find conspiracy and place constructive trust on life insurance proceeds); *see also Int'l Bankers Life Ins. v. Holloway*, 368 S.W.2d 567, 570 (Tex. 1963) (personal profits from commissions on sale of stock and sale of personal shares coupled with evidence of undisclosed participation in sale sufficient to establish conspiracy by company officers to defraud company). Unlike Kutach and Pennington, who as employees had received compensation from Unitech, Wooters received no payment, either from Unitech or from the nascent competing business.

Because no evidence demonstrates that Wooters knowingly participated in unlawful conduct for an improper gain beyond evidence of participation in plans to compete when Kutach and Pennington's employment ended, no evidence supports

a finding against Wooters for civil conspiracy to breach a fiduciary duty. *See Bluebonnet Petroleum,* 2009 WL 4527709, at *10.

Accordingly, we hold that the evidence is legally insufficient to support the finding that Wooters conspired to breach the fiduciary duties owed by Pennington or Kutach to Unitech. Because this liability finding provided the sole support for assessing damages against Wooters, it is dispositive of his appeal.

## CONCLUSION

We reverse the trial court's judgment against Wooters and render judgment that Unitech International, Inc. take nothing against Wooters. We affirm the judgment in all other respects.


Jane Bland
Justice

Panel consists of Justices Higley, Bland, and Massengale.