Opinion by Chief Justice Morriss
At the start of the almost five years that Samuel D. Orbison worked for Ma-Tex Rope Company, Inc. (Ma-Tex), he signed an employment agreement containing a non-competition agreement, a non-disclosure agreement, and a non-solicitation *25 agreement. During his tenure, he learned various things about Ma-Tex's business and customers and became the coordinator of Ma-Tex's recertification department. Orbison continued in that position until he resigned from Ma-Tex, went to work for Ma-Tex's competitor, American Pipe Inspections, Inc. (API), as the coordinator of its recertification department, and began soliciting work for API from Ma-Tex's customers. This lawsuit arose from that series of events and centers on Orbison's non-competition, non-disclosure, and non-solicitation agreements.
Ma-Tex fabricates and services equipment used in the oil and gas industry. As part of its services, Ma-Tex recertifies wireline[1] equipment for companies throughout the continental United States. Orbison began working for Ma-Tex in September 2011, at which time he executed the employment agreement that is at the center of this action. In July 2013, Orbison became the coordinator of Ma-Tex's recertification department. He resigned from Ma-Tex August 12, 2016.
Shortly after Orbison left its employ, Ma-Tex discovered that Orbison was working for API in the same position he had filled with Ma-Tex and that he was soliciting recertification work from Ma-Tex's customers. When Ma-Tex failed to receive a satisfactory response to its cease-and-desist letter sent to Orbison and API, Ma-Tex sued them and obtained a temporary restraining order barring Orbison and API from disclosing or using Ma-Tex's trade secrets and confidential information, from soliciting or serving Ma-Tex's customers, and from competing with Ma-Tex in the servicing and recertification of wireline equipment in nineteen states. After a bench trial on the merits, the trial court granted Ma-Tex a permanent injunction against Orbison and API and awarded Ma-Tex actual damages and attorney fees against Orbison and API.
In this appeal, Orbison and API (Appellants) assert that the trial court erred in admitting evidence of damages, in awarding damages, in enforcing the post-employment restrictions contained in the employment agreement, in issuing the permanent injunction, in denying Appellants' motion for sanctions, and in awarding attorney fees against them.
While we find that (1) there is insufficient evidence in this record to support the award of damages for lost profits and lost good will, we also conclude that (2) there was no abuse of discretion in issuing the permanent injunction, (3) there was no abuse of discretion in denying API's motion for sanctions, (4) there was no abuse of discretion in awarding attorney fees, (5) Appellants waived any objection to late-disclosed evidence by refusing the offered continuance, and (6) Appellants failed to preserve their complaint regarding termination of the employment contract. Therefore, we reverse the award of damages for lost profits and good will, delete the award of just those two elements of damages, and affirm the trial court's judgment in all other respects.
(1) There Is Insufficient Evidence in this Record to Support the Award of Damages for Lost Profits and Lost Good Will
Appellants challenge the legal sufficiency of the evidence to support the award of damages for lost profits, lost good will, fee forfeiture, and profit disgorgement.
*26 [2] In its findings of fact,[3] the trial court found that, but for Orbison's solicitation on behalf of API, Ma-Tex would have secured the two recertification orders of Halliburton Pinnacle and Arklatex and that it would have made a net profit of $2,321.00 on these orders. The trial court also found that Orbison's and API's actions in soliciting its customers caused Ma-Tex to lose good will of the value of $120,000.00. In addition, the trial court found that Orbison spent at least 10% of his working time between April 11, 2016, and August 12, 2016, assisting API in setting up its recertification division to the detriment of Ma-Tex. The trial court also entered conclusions of law that Ma-Tex should recover unjust enrichment damages as a result of Orbison's misappropriation of trade secrets, and for his breach of fiduciary duties, in the amount of $1,866.15 (10% of the salary paid to Orbison by Ma-Tex from April 16 through August 12, 2016), and $2,307.68 (the amount paid to Orbison by API from August 15 through August 31, 2016). Appellants challenge the legal sufficiency of the evidence to support these findings.[4]
"In reviewing a legal sufficiency complaint of an adverse finding on which the appellant did not have the burden of proof, the appellant must demonstrate on appeal that no evidence supports the adverse finding." Great N. Energy, Inc. v. Circle Ridge Prod., Inc. , 528 S.W.3d 644, 669 (Tex. App.-Texarkana 2017, pet. denied) (quoting Monasco v. Gilmer Boating & Fishing Club , 339 S.W.3d 828, 830 (Tex. App.-Texarkana 2011, no pet.) (citing Croucher v. Croucher , 660 S.W.2d 55, 58 (Tex. 1983) ) ). We will find the evidence legally insufficient only when the record shows
(1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence established conclusively the opposite of a vital fact.
Id. (quoting Monasco , 339 S.W.3d at 830 ) (citing Merrell Dow Pharms. v. Havner , 953 S.W.2d 706, 711 (Tex. 1997) ). "When the evidence offered to prove a vital fact is so weak as to do no more than create a *27 mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." Jelinek v. Casas , 328 S.W.3d 526, 532 (Tex. 2010) (quoting Kindred v. Con/Chem, Inc. , 650 S.W.2d 61, 63 (Tex. 1983) ). In considering legal sufficiency of evidence, we determine "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." E.R.C. , 496 S.W.3d at 284 (quoting City of Keller v. Wilson , 168 S.W.3d 802, 827 (Tex. 2005) ).
Lost Profits. In challenging the trial court's damage award of $2,321.00 for lost profits, Appellants challenge the legal sufficiency of the evidence supporting the trial court's findings (1) that without Orbison's solicitation on behalf of API, Ma-Tex would have secured the two recertification orders of Halliburton Pinnacle and Arklatex and (2) that Ma-Tex would have made a net profit of $2,321.00 on those orders. Assuming, without deciding, that sufficient evidence supports the trial court's finding that Ma-Tex would have secured the two recertification orders, we find that insufficient evidence supports its finding that Ma-Tex would have made a net profit of $2,321.00 on those orders.
The evidence at trial showed that Orbison's solicitation for API resulted in API securing one recertification job each from Halliburton Pinnacle and Arklatex. API's invoice to Halliburton Pinnacle showed charges for recertification of four 32" WTI sheaves, a load test and visual inspection of two chain slings and two wire rope slings, and a ½" Loc-a-loy, for total charges of $2,455.00. Its invoice to Arklatex showed charges for recertification of two 17" WTI sheaves, a break test on one prototype tool, and a line retention pin, for total charges of $885.00. Testimony regarding Ma-Tex's lost profits from these two lost sales came from Matthews, its president.[5] Matthews testified as follows:
Q. [By counsel for Ma-Tex] Would you please just assume for me I've done the math correctly, and that [the Halliburton Pinnacle and the Arklatex invoices] total $3,340?
A. That's correct.
Q. And then based on that number, has Ma-Tex then attempted to determine how much profit would be derived if they had done those two sales?
A. Yes, it was close to $2300.
....
Q. (BY MR. SMITH ) Make sure that our record is clear, how much was the amount that you just said?
....
A. It was 23-$2321 is your net profits on that-on those sales.
In Texas, what constitutes sufficient evidence of lost profit damages is well-established:
Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce *28 in court the documents supporting the opinions or estimates.
ERI Consulting Eng'rs, Inc. v. Swinnea , 318 S.W.3d 867, 876 (Tex. 2010) (quoting Holt Atherton Indus., Inc. v. Heine , 835 S.W.2d 80, 84 (Tex. 1992) (citations omitted) ). However, "[a] plaintiff 'must do more than show they suffered some lost profits.' " Lamont v. Vaquillas Energy Lopeno Ltd., LLP , 421 S.W.3d 198, 224 (Tex. App.-San Antonio 2013, pets. denied) (quoting Houston Mercantile Exch. Corp. v. Dailey Petrol. Corp. , 930 S.W.2d 242, 248 (Tex. App.-Houston [14th Dist.] 1996, no writ) (citing Szczepanik v. First S. Trust Co. , 883 S.W.2d 648, 649 (Tex. 1994) (per curiam) ) ). Although there may be more than one method of calculating lost profits, once a method has been chosen, there must be a complete calculation provided. Holt Atherton Indus., Inc. v. Heine , 835 S.W.2d 80, 85 (Tex. 1992).
Merely testifying as to the amount of claimed lost profits without providing any indication of how the lost profits were determined is legally insufficient evidence of lost profits. Id. at 84 ; see Columbia Med. Ctr. of Denton Subsidiary, L.P. v. DFW Super Grp. II, L.L.C. , No. 02-12-00507-CV, 2013 WL 5658185, at *2 (Tex. App.-Fort Worth Oct. 17, 2013, pet. denied) (mem. op.) (testimony as to amount of lost profits without evidence indicating how they were determined is legally insufficient); Village Square, Ltd. v. Barton , 660 S.W.2d 556, 559-60 (Tex. App.-San Antonio 1983, writ ref'd n.r.e.) (same); Frank B. Hall & Co. v. Beach, Inc. , 733 S.W.2d 251, 258 (Tex. App.-Corpus Christi 1987, writ ref'd n.r.e.) (same).
In this case, Matthews testified that Ma-Tex had lost profits of $2,321.00 based on the total amount API charged Halliburton Pinnacle and Arklatex. He provided no explanation of how these lost profits were determined, and Ma-Tex points to no other evidence in the record that provided an explanation of how the lost profits were determined. Rather, Ma-Tex points only to the API invoices and Matthews' testimony set forth above and claims that Matthews identified the goods and services involved, then "computed the incremental profit that Ma-Tex would have made on these projects." Even if we were to accept Ma-Tex's rather generous interpretation of Matthews' testimony, his testimony still does not provide this Court with the objective facts, figures, or data from which the amount of lost profits were calculated, nor the method he used to calculate them. Consequently, the evidence is legally insufficient to support the finding of $2,321.00 in lost profits. We sustain this appellate issue insofar as it relates to lost profits and reverse the trial court's award of damages for lost profits.
Goodwill. Appellants also challenge the legal sufficiency of the evidence supporting the trial court's finding that Ma-Tex suffered $120,000.00 in damages to its good will. Appellants argue that Ma-Tex offered no evidence of the value of its good will before Orbison's actions and offered no evidence showing how it reached its calculation of its damages. Ma-Tex responds that there is no set formula in determining good will damages and that Matthews' testimony shows he calculated the minimum loss based on his and Drew's time and the expenditure of company funds to repair its good will. Both parties point to the following testimony of Matthews as the only testimony regarding the amount of good will damages:[6]
*29 Q. [By Counsel for Ma-Tex] Has-has Ma-Tex undertaken to try to restore its good will it believes it has lost as a result of Mr. Orbison's conduct?
A. It's going to be very difficult to do so; it's going to take years to do that.
Q. Do you believe that Ma-Tex has actually suffered damage to its good will as a result of Mr. Orbison's conduct?
....
A. Are you talking about an amount for the good will?
Q. .... That is correct.
A. It's $120,000; 10,000 a month.
Q. And for how long? That 10,000 a month is for how long?
A. Twelve months.
Q. And for how much?
A. 120,000 total.
"Good will is generally understood to mean the advantages that accrue to a business on account of its name, location, reputation and success." Taormina v. Culicchia , 355 S.W.2d 569, 574 (Tex. Civ. App.-El Paso 1962, writ ref'd n.r.e.). Although good will is intangible, it is an integral part of a business, and damages may be recovered for its injury. Tex. & P. Ry. Co. v. Mercer , 127 Tex. 220, 90 S.W.2d 557, 560 (1936) ; see Marsh USA, Inc. v. Cook , 354 S.W.3d 764, 777 (Tex. 2011). The value of good will is based on "the fixed and favorable consideration of customers arising from an established and well-known and well-conducted business." Taormina , 355 S.W.2d at 574. The rule for measuring damage to good will "is the same as that for measuring damages to any other property." Mercer , 90 S.W.2d at 560. However, the nature of good will "preclude[s] a fixed standard by which its value might be determined in every case." Taormina , 355 S.W.2d at 575. Nevertheless, opinions as to the amount of good will damages must at least "be based on objective facts, figures or data from which the loss of good[ ]will may be ascertained." Auburn Invs., Inc. v. Lyda Swinerton Builders, Inc. , No. 04-08-00067-CV, 2008 WL 2923643, at *4 (Tex. App.-San Antonio July 30, 2008, no pet.) (mem. op.); see Ingram v. Deere , 288 S.W.3d 886, 903 (Tex. 2009) (unsupported opinion testimony insufficient evidence of value of good will). Although damages to good will may not be subject to precise calculation, an opinion as to its estimated value may not be based on speculation. Sw. Energy Prod. Co. v. Berry-Helfand , 491 S.W.3d 699, 712 (Tex. 2016).
In a proper case, damages to good will may be shown by evidence of the percentage of the salaries of employees required to forego regular duties, and of other expenses incurred, to repair the damage to the company's good will, in support of an opinion estimating the amount of damage to good will. See, e.g. , Dozor Agency, Inc. v. Rosenberg , 218 A.2d 583, 585-86 (Pa. 1966). However, no such evidence was offered in this case. Matthews merely testified that the damage to Ma-Tex's good will would be $10,000.00 a month for twelve months, totaling $120,000.00. Matthews never testified how he determined these estimates. Ma-Tex does not point to any testimony, and we have found none, that provides any objective facts, figures, or data in support of his opinion. See Auburn Invs., Inc. , 2008 WL 2923643, at *4. Consequently, we find the evidence is legally insufficient to support the trial court's finding of $120,000.00 in good will damages. We sustain Appellants' second issue insofar as it relates to good will damages, and we reverse the trial court's award of damages for good will.
*30 Other Damages. Appellants also challenge the trial court's conclusions that Orbison was liable for unjust enrichment damages for his misappropriation of Ma-Tex's trade secrets, and for fee forfeiture and profit disgorgement for the breach of his fiduciary duties to Ma-Tex.[7] They argue that, since Orbison was an employee of Ma-Tex, he is not subject to a "fee forfeiture" and that he was not subject to "profit disgorgement" since there was no evidence that he was paid a commission on the two recertification jobs performed by API. The question is, then, whether these remedies are available against an employee who merely receives a salary.
Generally, the term fiduciary "applies to any person who occupies a position of peculiar confidence towards another" and "contemplates fair dealing and good faith." Kinzbach Tool Co. v. Corbett-Wallace Corp. , 138 Tex. 565, 160 S.W.2d 509, 512 (1942). It is well established in Texas that an employee may be in a fiduciary relationship with his or her employer. See id. at 513 ; Wooters v. Unitech Int'l, Inc. , 513 S.W.3d 754, 762-63 (Tex. App.-Houston [1st Dist.] 2017, pet. denied). An employee may not, without breaching his fiduciary duties, "(1) appropriate the company's trade secrets, (2) solicit the former employer's customers while still working for his employer, (3) solicit the departure of other employees while still working for his employer; or (4) carry away confidential information." Wooters , 513 S.W.3d at 763 (citing Abetter Trucking Co. v. Arizpe , 113 S.W.3d 503, 512 (Tex. App.-Houston [1st Dist.] 2003, no pet.) ); see Johnson v. Brewer & Pritchard, P.C. , 73 S.W.3d 193, 202 (Tex. 2002). In an unchallenged conclusion of law, which is supported by the evidence, the trial court found Orbison breached his fiduciary duties in each of these ways.
When the court finds a breach of fiduciary duty, it may fashion an appropriate equitable remedy, including forfeiture of fees and disgorgement of any profit made at the expense of the employer. Swinnea , 318 S.W.3d at 873 ; Burrow v. Arce , 997 S.W.2d 229, 245-46 (Tex. 1999) ; Kinzbach Tool Co. , 160 S.W.2d at 514. As the Texas Supreme Court noted, when an agent breaches his fiduciary duty, he is entitled to no compensation for conduct related to the breach, and if his breach is willful, "he is not entitled to compensation even for properly performed services."[8] Burrow , 997 S.W.2d at 244 (quoting RESTATEMENT (SECOND) OF AGENCY § 469 (1958) ). The main purpose of these equitable remedies "is not to compensate an injured principal," but rather "to protect relationships of trust by discouraging agents' disloyalty." Swinnea , 318 S.W.3d at 872-73 (quoting Burrow , 997 S.W.2d at 238 ). Thus, a court "may disgorge all ill-gotten profits from a fiduciary when a fiduciary ... usurps an opportunity properly belonging to a principal, or competes with a principal." Id. (citing Johnson , 73 S.W.3d at 200 ). It may also require the fiduciary to forfeit any compensation for his work paid by the principal. Id.
Since the trial court found that Orbison breached his fiduciary duties to Ma-Tex, it had discretion to impose appropriate equitable remedies for the breach. Here, it elected to require forfeiture of a portion of *31 the compensation paid by Ma-Tex to Orbison during the period of time that Orbison was assisting API to set up its recertification shop and was soliciting two of Ma-Tex's employee's to work for API. In addition, the trial court required disgorgement of an amount equal to the compensation paid by API to Orbison during the time that Orbison was actively competing with Ma-Tex by using Ma-Tex's confidential information to solicit its customers. Under Swinnea and the cases cited therein, we see no essential distinction between forfeiting a fee paid to an attorney or trustee who breaches his fiduciary duty and forfeiting the salary paid to an employee who does the same. In each instance the breaching fiduciary received compensation from the principal while breaching his trust. Neither do we see an essential distinction between disgorging a fee paid to, or the profit made by, an agent who usurps his principal's business opportunity and disgorging an amount equal to the salary paid to a former employee by his new employer when the former employee uses confidential information and trade secrets to solicit the customers of his former employer. In each instance, the breaching fiduciary profited by, or received compensation for, breaching the trust of his principal. The same principles apply to each of these circumstances, and the remedies of forfeiture and disgorgement are "necessary to prevent such abuses of trust." Id. at 874.
Consequently, we find that, under the circumstances of this case, Orbison was subject to the forfeiture of his salary paid by Ma-Tex and to the disgorgement of the salary paid to him by API while he was actively using Ma-Tex's confidential information to solicit its customers. We overrule Appellants' second issue insofar as it relates to damages based on forfeiture and disgorgement.[9]
(2) There Was No Abuse of Discretion in Issuing the Permanent Injunction
Appellants challenge certain aspects of the restrictions contained in the permanent injunction.[10] A trial court's *32 grant or denial of a permanent injunction is reviewed for an abuse of discretion. In re Epperson , 213 S.W.3d 541, 542-43 (Tex. App.-Texarkana 2007, no pet.) (citing Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc. , 975 S.W.2d 546, 560 (Tex. 1998) ). The trial court abuses its discretion when it acts without reference to any guiding rules and principles. Downer v. Aquamarine Operators, Inc. , 701 S.W.2d 238, 241-42 (Tex. 1985).
In pertinent part, the permanent injunction provides that Orbison and API desist and refrain from:
Samuel D. Orbison
a. Directly or indirectly disclosing or using Ma-Tex's trade secrets and confidential information, which shall include Ma-Tex's (1) uniquely-developed tracking software, and information derived therefrom; and (2) all information about Ma-Tex's customers, including pricing information, purchase and bid histories, needs and requirements, and contact information of decision makers;
b. Directly or indirectly competing with Ma-Tex's niche business, in which it sells, services, and recertifies wireline equipment used in the upstream production of oil and gas, in the following United States markets: Texas, Louisiana, New Mexico, Oklahoma, Arkansas, Utah, Colorado, California, Kansas, Kentucky, Pennsylvania, Illinois, Mississippi, North Dakota, Nebraska, Montana, Ohio, Wyoming, and West Virginia, until August 12, 2021;
....
American Piping Inspection, Inc.
a. Directly or indirectly disclosing or using Ma-Tex's trade secrets and confidential information, which shall include Ma-Tex's (1) uniquely-developed tracking software, and information derived therefrom; and (2) all information about Ma-Tex's customers, including pricing information, purchase and bid histories, needs and requirements, and contact information of decision makers; and
b. Directly or indirectly interfering with the Employment Agreement dated September 15, 2011 between Samuel D. Orbison and Ma-Tex, including the post-employment restrictions contained in the Employment Agreement.
Appellants first complain that the trial court abused its discretion in enjoining Orbison from using Ma-Tex's tracking software because, they contend, there is no evidence that he used the tracking software after he left Ma-Tex. However, the evidence at trial showed that Orbison had been trained on, and had used, Ma-Tex's tracking software. Shortly before he left the employ of Ma-Tex, Orbison sent an email to API listing "the high value items" that needed to be in place for API to begin processing recertification orders. Included in the high value items was a "Certificate tracking website" that Drew identified as Ma-Tex's Customer Care Center (CCC), *33 its web-based tracking system. In the email, Orbison offered his upcoming vacation time to work on setting up API's shop. Shortly after Orbison began working for API, he sent an email to one of Ma-Tex's customers, Schlumberger, stating that "[t]he Bradford, PA location has some items that need to be recertified in the near future." Drew testified that this information was contained in its CCC, or tracking, software. In addition, the trial court made an unchallenged finding that Orbison disclosed to API the concept of Ma-Tex's logistical/distribution network and corresponding tracking software.
This evidence demonstrates that Orbison had used and disclosed Ma-Tex's tracking software and the information derived from it for the benefit of API and to the detriment of Ma-Tex, both before and after he left Ma-Tex's employment. Under these circumstances, we find that the trial court did not abuse its discretion in enjoining Orbison from disclosing or using Ma-Tex's tracking software and the information derived from it.
Appellants also complain that the trial court abused its discretion by enjoining Orbison from soliciting Ma-Tex customers because, they contend, it is impossible for Orbison or API to ascertain who those customers might be. We interpret this complaint as relating to that portion of the injunction that enjoins Orbison from disclosing or using any information about Ma-Tex's customers. Among the unchallenged findings of fact that are supported by the evidence, the trial court found that Ma-Tex provided Orbison various customer information confidential to Ma-Tex, including information more specifically listed in the court's findings numbered 22-24 and 28-29 in the Appendix to this opinion.
In this case, Orbison was bound by the post-employment restrictions from competing with Ma-Tex and from disclosing or using any of Ma-Tex's confidential information. This confidential information included any customer information. It is well established that "a former employee is precluded from using for his own advantage, and to the detriment of his former employer, confidential information or trade secrets acquired by or imparted to him in the course of his employment," even in the absence of an enforceable contractual post-employment restriction. Rugen v. Interactive Bus. Sys., Inc. , 864 S.W.2d 548, 551 (Tex. App.-Dallas 1993, no writ) (quoting Johnston v. Am. Speedreading Academy, Inc. , 526 S.W.2d 163, 166 (Tex. Civ. App.-Dallas 1975, no writ) ). An injunction is a proper remedy to protect confidential information. Id. (citing Hyde Corp. v. Huffines , 158 Tex. 566, 314 S.W.2d 763 (1958) ). When the confidential information sought to be protected includes the identity of the complaining party's customers, the injunction need not identify those customers because to do so would defeat the purpose of the injunction. Safeguard Bus. Sys., Inc. v. Schaffer , 822 S.W.2d 640, 644 (Tex. App.-Dallas 1991, no writ) (citing Cottingham v. Engler , 178 S.W.2d 148, 151 (Tex. Civ. App.-Dallas 1944, no writ) ). Further, it is not unreasonable "to assume that [the former employee] who is sought to be enjoined is sufficiently familiar with the employer's business and its customers to avoid violating the injunction." Id. (citing Cottingham , 178 S.W.2d at 151 ).
In this case, it is reasonable to assume that, because of Orbison's position as manager of Ma-Tex's recertification division, which gave him substantial contact with its customers, Orbison has the necessary knowledge of Ma-Tex's customers to enable Appellants to avoid violating the injunction. Further, the evidence also showed that Orbison has a list of Ma-Tex's wireline recertification customers and their *34 contact information in the contacts stored on his personal cellular telephone. Under these circumstances, we find that the injunction is sufficiently clear to enable Appellants to obey it. Consequently, we find that the trial court did not abuse its discretion in failing to identify Ma-Tex's customers in the permanent injunction.[11]
Appellants also complain that the injunction is not clear as to whether Orbison can work in the listed states, or if he can perform work for customers in those states if he does it for a company that is not a Ma-Tex customer. We interpret their complaint as relating to that portion of the injunction that restrains Orbison from "[d]irectly or indirectly competing with Ma-Tex's niche business, in which it sells, services, and recertifies wireline equipment used in the upstream production of oil and gas" in nineteen listed states until August 12, 2021.[12] "An injunction must be definite, clear, and concise, leaving the person enjoined in no doubt about his duties, and should not be such as would call on him for interpretations, inferences, or conclusions." Vaughn v. Drennon , 202 S.W.3d 308, 316 (Tex. App.-Tyler 2006, no pet.) (citing Gulf Oil Corp. v. Walton , 317 S.W.2d 260, 264 (Tex. Civ. App.-El Paso 1958, no writ) (per curiam) ). To the extent that Orbison proposes to perform work in the nineteen states that is related to the sales, service, or recertification of wireline equipment used in the upstream production of oil and gas, the injunction clearly restrains him from doing so, regardless of whether it is performed for Ma-Tex's current customers, until August 12, 2021. At the same time, the injunction does not restrain Orbison from performing work that is not related to the sales, service, or recertification of wireline equipment used in the upstream production of oil and gas in those nineteen states, even if such work is performed for a customer of Ma-Tex. He remains unrestrained in states other than the specified nineteen states.
The evidence at trial and the unchallenged findings of the trial court show that Orbison became the manager of Ma-Tex's recertification division in 2013 and remained in that position until August 12, 2016. It is not unreasonable to assume that, based on his three years as manager of the recertification division, Orbison can easily ascertain what actions or work would be related to the sales, service, and recertification of wireline equipment. The injunction is sufficiently clear to inform Orbison of his obligations under the injunction.
For the reasons stated, the trial court did not abuse its discretion as to the injunctive relief, and we overrule this issue.
(3) There Was No Abuse of Discretion in Denying API's Motions for Sanctions
Appellants contend that the trial court abused its discretion in denying the motion for sanctions brought pursuant to Rule 13 of the Texas Rules of Civil Procedure and Section 10.001 of the Texas Civil Practice and Remedies Code. See TEX. R. CIV. P. 13 ; TEX. CIV. PRAC. & REM. CODE ANN. § 10.001 (West 2017). API originally *35 filed a motion for sanctions as a counterclaim,[13] alleging that Ma-Tex had joined it as a defendant in several of its causes of action that were groundless and brought in bad faith. This motion was denied by the trial court in its corrected final judgment. API also filed a post-judgment motion for sanctions under Rule 13 and Section 10.001, asserting that several of the pleadings and motions filed by Ma-Tex had been filed in bad faith and without any factual basis or proper investigation. The trial court also denied that motion.
We review a trial court's order on a motion for sanctions under Rule 13 and Section 10.001 for an abuse of discretion. Low v. Henry , 221 S.W.3d 609, 614 (Tex. 2007) ; Mobley v. Mobley , 506 S.W.3d 87, 93 (Tex. App.-Texarkana 2016, no pet.) ; R.M. Dudley Const. Co. v. Dawson , 258 S.W.3d 694, 707, 709 (Tex. App.-Waco 2008, pet. denied). We will reverse the trial court's ruling "only if the trial court acted without reference to any guiding rules or principles, such that its ruling was arbitrary or unreasonable." Mobley , 506 S.W.3d at 93 (quoting Low , 221 S.W.3d at 614 ).
In considering a motion for sanctions, the trial court is to presume that the pleadings were filed in good faith. Low , 221 S.W.3d at 614 ; see TEX. R. CIV. P. 13. It is the burden of the party seeking sanctions to overcome the presumption of good faith. Low , 221 S.W.3d at 614 (citing GTE Commc'ns Sys. v. Tanner , 856 S.W.2d 725, 731 (Tex. 1993) ). To prevail on a motion for sanctions under Rule 13, the movant must establish that the suit was (1) groundless and (2) brought either in bad faith or for the purpose of harassment. Mobley , 506 S.W.3d at 94 (citing TEX. R. CIV. P. 13). Under Section 10.001, the movant must establish "(1) that the pleading or motion was brought for an improper purpose, (2) that there were no grounds for the legal arguments advanced, or (3) that the factual allegations or denials lacked evidentiary support." Id. at 95 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 10.001 (West 2002) ). An " 'improper purpose' [is] the equivalent of 'bad faith' under Rule 13." Id. (quoting Dike v. Peltier Chevrolet, Inc. , 343 S.W.3d 179, 183-84 (Tex. App.-Texarkana 2011, no pet.) ).
Both Rule 13 and Section 10.001 require an evidentiary hearing to enable the trial court "to make the necessary factual determinations about the motives and credibility of the person signing the allegedly groundless pleading." Click v. Transport Workers Union Local 556 , No. 05-15-00796-CV, 2016 WL 4239473, at *2 (Tex. App.-Dallas Aug. 10, 2016, no pet.) (mem. op.) (citing Dawson , 258 S.W.3d at 709 ; Keith v. Solls , 256 S.W.3d 912, 917 (Tex. App.-Dallas 2008, no pet.) ). Without an evidentiary hearing, "the trial court has no evidence before it to determine that a pleading was filed in bad faith or to harass." Mobley , 506 S.W.3d at 95 (quoting Alejandro v. Robstown Indep. Sch. Dist. , 131 S.W.3d 663, 669-70 (Tex. App.-Corpus Christi 2004, no pet.) ). The movant must secure an evidentiary hearing. Click , 2016 WL 4239473, at *2 (citing Trussell Ins. Servs., Inc. , 2010 WL 5031100, at *4 ).
*36 Several of our sister courts of appeal have held that sanctions for violations of Rule 13 or Section 10.001 that are known to the movant before trial are forfeited if an evidentiary hearing and ruling are not secured before trial. Trussell Ins. Servs., Inc. , 2010 WL 5031100, at *4 ; see Click , 2016 WL 4239473, at *2.
The record in this case shows that API neither requested nor obtained an evidentiary hearing on its original motion for sanctions before the trial of the case. Nevertheless, Appellants point to certain testimony at trial which they contend shows that several affidavits and pleadings filed by Ma-Tex were filed in bad faith. Even assuming this testimony could be used to support API's motion for sanctions, it does not show bad faith on the part of Ma-Tex. First, Appellants point to certain testimony by Matthews that they contend shows Matthews admitted that he had no evidence that API's and Orbison's actions had caused his company to lose customers. However, an examination of Matthews' testimony indicates that, although he had information of at least one customer who Ma-Tex had lost, that evidence had not at that point been presented. Appellants also claim that Matthews admitted that Ma-Tex did not produce any documents to support its damages. Again, an examination of the testimony relied on by Appellants shows that Matthews testified that Ma-Tex had produced the specific documents requested, but had not produced documents that had not been requested by Appellants. Appellants' brief also claims that Drew signed an affidavit accusing API and Orbison of stealing Ma-Tex's custom tracking software, and it points to testimony rebutting that accusation. However, Drew's affidavit made no such claim. Rather, he averred that Orbison was using and disclosing confidential information and trade secrets, including its proprietary tracking software, to solicit Ma-Tex's customers. This statement can reasonably be construed to mean Orbison was using the confidential information contained in the tracking software to solicit Ma-Tex's customers. None of this testimony shows bad faith, that there were no grounds for the legal arguments advanced, or that the factual allegations lacked evidentiary support.
Finally, although API obtained a hearing on its post-judgment motion for sanctions, it merely argued its motion and presented no evidence to the trial court. In the sanctions context, "[e]vidence must be admitted under the rules of evidence at the evidentiary hearing for a trial court to consider it." Dawson , 258 S.W.3d at 710 (citing Alejandro v. Bell , 84 S.W.3d 383, 393 (Tex. App.-Corpus Christi 2002, no pet.) ; McCain v. NME Hosps., Inc. , 856 S.W.2d 751, 757 (Tex. App.-Dallas 1993, no writ) ). "Motions and arguments of counsel are not evidence in a sanction hearing context." Click , 2016 WL 4239473, at *2 (citing McCain , 856 S.W.2d at 757 ). This record shows that API did not establish that the pleadings and motions of Ma-Tex were filed in bad faith or for the purpose of harassment, or that Ma-Tex's claims against API were brought for an improper purpose, that there were no grounds for the legal arguments advanced, or that the factual allegations lacked evidentiary support. See Mobley , 506 S.W.3d at 96.
On this record, we find that the trial court did not abuse its discretion in denying API's motion for sanctions. We overrule this issue.
(4) There Was No Abuse of Discretion in Awarding Attorney Fees
Appellants also assert that the trial court erred in awarding attorney fees against them. At trial, Ma-Tex's attorney testified that the total amount of attorney *37 fees incurred in prosecuting the claims that were recoverable under its pleadings was $216,399.00 and introduced fee statements in support of his testimony.[14] He also testified that Ma-Tex had incurred attorney fees in the amount of $19,557.00 related to claims for which attorney fees were not recoverable. The trial court's corrected judgment provided that Ma-Tex recover from Orbison and API, jointly and severally, attorney fees in the amount of $216,399.00 through trial for Ma-Tex's breach of contract and misappropriation of trade secrets claims.
As a prerequisite to appellate review, the record must show that Appellants raised the complaint at the trial court by a timely objection, request, or motion that stated the grounds of the complaint, and that the trial court either ruled, or refused to rule, on the complaint. Jaimes v. Mersha , No. 06-15-00079-CV, 2016 WL 2609291, at *5 (Tex. App.-Texarkana May 6, 2016, no pet.) (mem. op.); see TEX. R. APP. P. 33.1(a). Further, "[a]n objection at trial that does not comport with a point of error on appeal preserves nothing for review." Anderson v. Snoddy , No. 06-14-00096-CV, 2015 WL 5634564, at *11 (Tex. App.-Texarkana Sept. 25, 2015, pet. denied) (mem. op.).
The only objection asserted by Appellants at trial was to the amount of attorney fees allocated to the claims for which attorney fees were not recoverable.[15] In addition, Appellants requested amended findings of fact and conclusions of law in which they argued that Ma-Tex had not properly segregated the amount of its attorney fees related to claims for which attorney fees are not recoverable, that Ma-Tex was not entitled to attorney fees for breach of contract because it had not proved its breach of contract damages, and that Ma-Tex was not entitled to attorney fees for misappropriation of trade secrets because it failed to prove that any misappropriation was willful and malicious.[16]
On appeal, Appellants assert that the trial court erred in awarding attorney fees against API (1) for breach of contract because there was no privity of contract between API and Ma-Tex and (2) for misappropriation of trade secrets because the trial court made no finding of willful and malicious misappropriation. They also assert that the trial court erred in awarding attorney fees against Orbison (1) for breach of contract because Ma-Tex failed to prove causation and damages and (2) for misappropriation of trade secrets because the trial court made no finding of willful and malicious misappropriation.
To the extent that these complaints do not comport with the objections made by Appellants at trial and were not asserted by Appellants in a motion for new trial or other post-judgment filing, they were not preserved for our review. See Jaimes , 2016 WL 2609291, at *5 ; Snoddy , 2015 WL 5634564, at *11. To the extent they were preserved, we note that, contrary to Appellants' assertion, the trial court found that the misappropriation of trade secrets *38 was willful and malicious. The trial court entered a conclusion of law that "[u]nder Tex. Civ. Prac. & Rem. Code § 134A.005(3), Ma-Tex is entitled to recover its reasonable and necessary attorney's fees in the amount of $216,399 from Orbison and API because Orbison's and API's misappropriation was willful and malicious." Although the trial court's finding that Orbison's and API's misappropriation was willful and malicious was included in a conclusion of law, "the designation is not controlling and we may treat it as a finding of fact." Ray v. Farmers' State Bank of Hart , 576 S.W.2d 607, 608 n.1 (Tex. 1979) (citing McAshan v. Cavitt , 149 Tex. 147, 229 S.W.2d 1016 (1950) ). Since this finding is unchallenged on appeal and there is some evidence to support it, we are bound by it. See E.R.C. , 496 S.W.3d at 288.
Attorney fees may be awarded to a prevailing party in a misappropriation of trade secrets case if the misappropriation was willful and malicious. TEX. CIV. PRAC. & REM. CODE ANN. § 134A.005(3). Therefore, the trial court did not err in awarding attorney fees to Ma-Tex for Orbison's and API's misappropriation of its trade secrets.[17] We overrule this issue.
(5) Appellants Waived any Objection to Late-Disclosed Evidence by Refusing the Offered Continuance
Appellants contend that the trial court erred in admitting any damage evidence. Their complaint is founded on Ma-Tex's allegedly untimely supplementation to their requests for disclosures and interrogatories, which Appellants argue prejudiced and unfairly surprised them.
Generally, a party who fails to timely amend or supplement a discovery response requesting evidence or the identity of witnesses may not introduce the evidence or offer the testimony of the witness at trial. TEX. R CIV. P. 193.6(a) ; Jackson v. Gould , No. 01-16-00203-CV, 2016 WL 5957214, at *5 (Tex. App.-Houston [1st Dist.] Oct. 13, 2016, no pet.) (mem. op.). However, the trial court may admit the evidence or allow the witness to testify if the proponent shows there is good cause for its failure to timely amend its response or identify the witness, or a lack of unfair prejudice or unfair surprise to the other parties. TEX. R CIV. P. 193.6(a)(1), (2), (b) ; Jackson , 2016 WL 5957214, at *5. Even if the proponent cannot show good cause or the lack of unfair prejudice or of unfair surprise, the trial court may grant a continuance or temporarily delay the trial "to allow opposing parties to conduct discovery regarding any new information presented by that response." TEX. R CIV. P. 193.6(c) ; Jackson , 2016 WL 5957214, at *5.
In this case, API served its request for disclosures[18] with its original answer on September 21, 2016.[19] API also served interrogatories on Ma-Tex, in which it asked Ma-Tex to identify each category or type of damage it was seeking to recover and the method and data fields used in calculating each damage category. On November 2, 2016, Ma-Tex responded to the request for disclosures and stated that its damages included loss of good will, customers, *39 profits, and the benefit of its trade secrets, and that it would supplement its response with the amount and methods of calculating its damages. On November 8, 2016, Ma-Tex responded to API's interrogatories regarding damages in essentially the same manner. Ma-Tex did not supplement its responses to the requests for disclosures until May 3, 2017, when it identified the amount of each of its claimed damages and the general basis of how each was calculated. On May 5, 2017, Ma-Tex supplemented its responses to API's interrogatories in the same manner. On the same day, Ma-Tex again supplemented its responses to the requests for disclosures and identified, for the first time, two of Ma-Tex's officers, Drew and Matthews, as experts who would testify regarding its damages. On May 9, 2017, API filed a motion asking the trial court to strike Ma-Tex's supplemented responses as untimely, which was denied by the trial court.
Before the trial began on June 5, 2017, Appellants reasserted their objections to Ma-Tex's late designation of its damage models and of Drew and Matthews as experts on damages. Appellants argued that, because of the late disclosures, they were deprived of the opportunity to review any of the underlying financial records that formed the basis of the damage calculations and the chance to retain their own rebuttal expert. In addition, Appellants pointed out that, in the second deposition of Drew, taken before the supplementation, Drew was instructed to not answer questions regarding damages. As a result, Appellants claimed that they had been prejudiced and unfairly surprised.
After noting that because Ma-Tex was seeking an injunction, the trial schedule had been expedited, the trial court offered Appellants the following relief:
THE COURT: .... Court's relief's going to be to you, [Appellant], is if you believe that you would be prejudiced by the late production, would be a continuance of this trial setting.... [S]o that you have an opportunity to explore further the issues; the damage model, the information behind the damage model. Would you like a continuance, Counsel?
In response, Appellants rejected the offered continuance, arguing that it was Ma-Tex's burden to show good cause for the late supplementation of their discovery responses. The trial court then overruled Appellants' objection.
Even before the current rules expressly allowed the trial court to provide relief for an untimely, or lack of, supplementation of a discovery response, by granting a continuance or postponement of the trial, we recognized the trial court's inherent authority to do so. See Wal-Mart Stores, Inc. v. Tinsley , 998 S.W.2d 664, 671-72 (Tex. App.-Texarkana 1999, pet. denied) (citing Alvarado v. Farah Mfg. Co. , 830 S.W.2d 911, 915-16 (Tex. 1992) ). In Tinsley , we held that a party complaining of the admission of evidence on the basis of a failure to supplement discovery, who refused the trial court's offer to postpone the trial to allow the party to conduct any needed discovery, waived any complaint about the admission of the evidence. Id. at 672.
After Tinsley , the rules of civil procedure have been amended to expressly allow the trial court to fashion a remedy to correct any prejudice to the opposing parties caused by a party's late, or lack of, supplementation by continuing or postponing the trial. See TEX. R CIV. P. 193.6(c). In this case, the trial court offered the remedy provided in Rule 193.6(c), but Appellants refused to continue the trial. In similar circumstances, several of our sister courts of appeals have found a waiver of any complaint under Rule 193.6. See *40 Santos v. Comm'n for Lawyer Discipline , 140 S.W.3d 397, 404 (Tex. App.-Houston [14th Dist.] 2004, no pet.) ; see also Jackson , 2016 WL 5957214, at *5 ; Walters v. Northcutt , No. 12-03-00247-CV, 2005 WL 341694, at *5 (Tex. App.-Tyler Feb. 10, 2005, no pet.) (mem. op.); Tri-Flo Int'l v. Jackson , No. 13-01-472-CV, 2002 WL 31412532, at *2 (Tex. App.-Corpus Christi Oct. 24, 2002, no pet.). Likewise, we hold that, by refusing the offered continuance, Appellants waived any complaint regarding the admission of late-disclosed damage evidence or the damage testimony of Drew and Matthews. See Tinsley , 998 S.W.2d at 672 ; Jackson , 2016 WL 5957214, at *5.[20] We overrule this issue.
(6) Appellants Failed To Preserve Their Complaint Regarding Termination of the Employment Contract
Appellants complain of the trial court's enforcement of the post-employment restrictions contained in the employment agreement. As previously noted, the relevant non-competition, non-disclosure, and non-solicitation agreements were contained within Orbison's employment agreement. Appellants assert, without citation to authority,[21] that, since these post-employment restrictions did not contain a saving clause, they were terminated when Orbison sent his notice that he was terminating the employment agreement.[22] We find that Appellants have waived this complaint.
The Texas Rules of Appellate Procedure require an appellant to present "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i) ; In re Estate of Curtis , 465 S.W.3d 357, 379 (Tex. App.-Texarkana 2015, pet. dism'd). "Bare assertions of error, without argument or authority, waive error." Curtis , 465 S.W.3d at 379 (quoting McKellar v. Cervantes , 367 S.W.3d 478, 484 n.5 (Tex. App.-Texarkana 2012, no pet.) ). Appellants' sole basis for their complaint is that the post-employment restrictions do not contain a saving clause. In their brief, Appellants contend that, in order to survive the termination of the employment agreement, these provisions must contain a saving clause. However, they cite no authority in support of this contention and make no cogent argument explaining why, under the terms of the *41 agreement, a saving clause is necessary. Consequently, Appellants have waived their complaint. See Curtis , 465 S.W.3d at 379.
Conclusion
In clause (A) of its corrected judgment dated October 9, 2017, in the paragraph awarding dollar amounts, the trial court awarded Ma-Tex actual damages of $126,494.83 against Orbison and API, jointly and severally. As noted above, the trial court entered findings of fact and conclusions of law in which it found that these actual damages consisted of $2,321.00 in lost profits, $120,000.00 in lost good will, and damages for unjust enrichment, fee forfeiture, and profit disgorgement in the aggregate amount of $4,173.83. We have determined that legally insufficient evidence supports the trial court's award of damages for lost profits and lost good will. Consequently, in said clause (A), the trial court should have awarded actual damages of $4,173.83.
Therefore, for the reasons stated, we reverse the trial court's award of damages for lost profits and loss of goodwill and render judgment, under clause (A) in the judgment's paragraph awarding dollar amounts, that Ma-Tex Wire Rope Company, Inc., have and recover from Samuel D. Orbison and American Piping Inspection, Inc., jointly and severally, actual damages in the sum of $4,173.83. We affirm the trial court's judgment in all other respects.
Appendix to Opinion
Samuel D. Orbison and American Piping Inspection , Inc. v. Ma-Tex Rope Company , Inc.
06-17-00112-CV
Among the findings of the trial court are included the following:
6. Ma-Tex is an oil and gas services company formed in the 1960s.
7. Ma-Tex's headquarters are in Kilgore, Texas, and it has office locations in Alice, Pleasanton, and Midland, Texas, and in Shreveport, Louisiana.
8. Ma-Tex has five divisions: rigging fabrication, nylon fabrication, electric wireline, cable service (sand line and drill line), and recertification.
9. Wireline recertification is a subset within the recertification division, and represents about 80 percent of Ma-Tex's total recertification business.
10. Ma-Tex's wireline recertification business is a niche business within the oil and gas industry, selling, servicing, and recertifing wireline equipment used in the upstream sector of the industry.
11. Ma-Tex's wireline recertification customers are in the oil and gas business and are located throughout the United States, including the following states: Texas, Louisiana, New Mexico, Oklahoma, Arkansas, Utah, Colorado, California, Kansas, Kentucky, Pennsylvania, Illinois, Mississippi, North Dakota, Nebraska, Montana, Ohio, Wyoming, and West Virginia.
12. Over the past decade, Ma-Tex has grown its recertification business-and gained a competitive advantage-by developing and honing effective procedures for inspecting and recertifying wireline equipment, including a unique distribution network that increases convenience for customers and reduces the turnaround time for wireline recertification.
13. Ma-Tex also uses a uniquely-developed software application to oversee its recertification business and to provide customers with an online portal for monitoring the status of their *42 wireline equipment inspection and recertification.
14. Ma-Tex developed its wireline recertification customers and contacts through its preexisting relationships in its electric wireline division, which took years to develop, through many years of sales calls, trips, and consulting.
15. Ma-Tex does not publicize its recertification procedures, prices, or customer contacts and profiles, and Ma-Tex has spent considerable time and resources to protect the information and keep it confidential; e.g., Ma-Tex requires every employee to sign a non-disclosure agreement before they may access Ma-Tex's confidential business information, and Ma-Tex limits access to certain customer information, including as pricing, within its offices.
16. Ma-Tex hired Orbison as a management trainee and employed Orbison from September 15, 2011 until August 12, 2016.
17. To protect Ma-Tex's confidential information, trade secrets, and good will, Orbison and Ma-Tex entered into an employment agreement on September 15, 2011, which contained non-competition, non-solicitation, and non-disclosure restrictions.
18. Ma-Tex agreed to provide Orbison with trade secrets, confidential information, and specialized training in exchange for Orbison's non-disclosure and non-solicitation agreements, and Orbison's covenant not-to-compete with Ma-Tex during the term of his employment and thereafter for five (5) years within three-hundred fifty (350) miles of Kilgore, Texas or any other geographical region where Ma-Tex does business.
19. After Orbison signed the Employment Agreement, Ma-Tex shared its trade secrets and confidential information with Orbison and also provided him with unique and specialized training; therefore, the covenant not-to-compete in the Employment Agreement was supported by adequate consideration.
20. The business good will, confidential or propriety information, trade secrets, customer information, and specialized training provided by Ma-Tex to Orbison over the course of five (5) years were and are worthy of protection by a covenant not-to-compete with Orbison.
21. The restriction period of five (5) years, the geographic restriction, and the restricted activity contained in the covenant not-to-compete are reasonable, both individually and collectively. They impose no greater restraint than is necessary to protect the business goodwill, confidential and proprietary information, trade secrets, customer information, and specialized training that Ma-Tex provided to Orbison.
22. Ma-Tex provided Orbison with various forms of confidential information and trade secrets, including design techniques, customer lists and information, vendor information, software programs (such as the Customer Care Center ("CCC") ), sales database with customer profiles, billing and pricing information, and marketing strategies.
23. The specific types of customer information Ma-Tex shared with Orbison included, among others, customer name, location, and contact information of decision makers; custom needs and requirements; custom pricing profiles; and purchasing history.
24. Orbison put the Ma-Tex customer contacts into his company-issued *43 iPhone and his personal Samsung Galaxy phone.
....
26. When Orbison started working for Ma-Tex, he was a recent college graduate and (A) he had no prior experience in Ma-Tex's business of recertifying wireline equipment, nor in the oil and gas industry in general; (B) he did not know any of Ma-Tex's customers or vendors, and had no potential customers or vendors of his own to solicit; (C) he knew nothing about Ma-Tex's logistical network; (D) he knew nothing about Ma-Tex's tracking software; and (E) he knew nothing about Ma-Tex's pricing structure.
....
28. In 2013, Orbison became manager of Ma-Tex's recertification division-a role in which he had substantial contact with Ma-Tex's customers and vendors and in which he was intimately involved in pricing, logistics, tracking software, etc.
29. Orbison worked with Ma-Tex's wireline recertification customers located throughout the United States, including the following states: Texas, Louisiana, New Mexico, Oklahoma, Arkansas, Utah, Colorado, California, Kansas, Kentucky, Pennsylvania, Illinois, Mississippi, North Dakota, Nebraska, Montana, Ohio, Wyoming, and West Virginia.
30. Josh Tema and Robert Horton were the other primary employees working with Orbison in Ma-Tex's recertification division.
31. Orbison notified Ma-Tex around July 20, 2016 that he was quitting his employment with Ma-Tex.
....
33. Orbison's last day of employment with Ma-Tex was on August 12, 2016.
....
36. Unbeknownst to Ma-Tex, Orbison began interviewing for a job with API in the spring of 2016 while still an employee of Ma-Tex.
37. Before becoming associated with Orbison in 2016, API was not in the wireline recertification business at all but wanted to get into that business.
....
39. During Orbison's last four months with Ma-Tex-beginning on April 6, 2016-Orbison and API's Vice President of Operations, David Alcorn ("Alcorn"), exchanged approximately 160 text messages and had approximately 22 phone calls.
40. Alcorn had the authority on behalf of API to hire Orbison and to communicate with Orbison between April and August 2016.
41. Orbison also communicated with API in this timeframe by email....
42. API knew Orbison was employed by Ma-Tex in its recertification division and that API's new recertification division would be in competition with Ma-Tex.
43. In their communications, Orbison and Alcorn discussed (A) Orbison's Employment Agreement with Ma-Tex and its covenant not-to-compete; (B) the financial performance of Ma-Tex's recertification division; (C) API hiring additional Ma-Tex employees and their compensation; (D) equipment necessary to open a competing recertification division; (E) inventory orders with Ma-Tex vendors; and (F) soliciting Ma-Tex customers to move their business to API.
44. Orbison also disclosed to API the concept of Ma-Tex's logistical/distribution *44 network and corresponding tracking software.
45. Orbison had actual knowledge of his Employment Agreement with Ma-Tex and its post-employment restrictions.
46. As early as April 27, 2016, and no later than June 7, 2016, API had knowledge of facts from which a reasonable person would conclude that Orbison had an employment agreement with Ma-Tex that contained post-employment restrictions.
47. As early as June 7, 2016, and no later than August 24, 2016, API had actual knowledge of Orbison's Employment Agreement with Ma-Tex and its post-employment restrictions.
....
51. API was familiar with covenants not-to-compete from its recent involvement in a lawsuit in which API was accused of hiring two employees who had covenants not-to-compete.
52. Before leaving Ma-Tex's employment, Orbison solicited Ma-Tex's recertification customers in an effort to move their recertification business to API.
53. Before and after leaving Ma-Tex's employment, Orbison solicited other Ma-Tex employees (Josh Tema and Robert Horton) to leave Ma-Tex and go work for API.
54. Before leaving Ma-Tex's employment, Orbison assisted API in preparing to open its new recertification division, which would compete with Ma-Tex.
55. API knew Orbison was performing tasks to benefit API while he was still employed by Ma-Tex.
56. API hired Orbison as the manager of its new recertification division.
57. API also hired Josh Tema and Robert Horton to work in its new recertification division, with knowledge that Tema and Horton were then working for Ma-Tex in its recertification division.
....
59. Orbison's first official day of employment with API was August 15, 2016.
...
60. On August 16, 2016, after resigning his employment and turning in his Ma-Tex iPhone, Orbison accessed his personal iCloud account, downloaded the customer contacts from his Ma-Tex iPhone, and transferred those contacts to a non-Ma-Tex device.
61. Beginning on August 16, 2016, being employed by API, Orbison sent dozens of solicitation emails to Ma-Tex's customers-including its top 20 customers-in an effort to secure their recertification business for API.
62. API authorized Orbison to send these solicitation emails, and the emails were sent from an API email account on its server.
63. The customers that Orbison solicited were the same customers he learned of and interacted with while employed by Ma-Tex.
64. Orbison's solicitation emails included "discounted" price lists in the same format as the price lists Orbison used as manager of Ma-Tex's recertification division; API prices were consistently discounted by 20-25% off Ma-Tex pricing.
65. Orbison used the customer contacts and pricing information he obtained while working for Ma-Tex to solicit business for API.
66. API admits it established pricing for wireline recertification services in *45 a group effort with Orbison, who provided feedback to API.
67. Orbison's solicitations resulted in two recertification orders for API: one with Halliburton Pinnacle of Houston, Texas ("Halliburton Pinnacle") for $2,455 and one with Arklatex Energy Services of Broussard, Louisiana ("Arklatex") for $885.
68. API completed these two recertification jobs on August 31, 2016 and invoiced Halliburton and Arklatex, respectively, on September 21, 2016.
69. Orbison was introduced to Halliburton Pinnacle and Arklatex by Ma-Tex and Orbison dealt with these two customers while working for Ma-Tex.
....
74. API admits that it would take a while, approximately three to five years, to establish a wireline recertification division in the marketplace.
75. By consulting with and hiring Orbison, and using his knowledge and customer and vendor contacts, API was able to establish its wireline recertification division in approximately four months.
76. After receiving Ma-Tex's cease and desist letter with a copy of Orbison's Employment Agreement and its post-employment restrictions, API and Orbison did the following: performed two recertification jobs (Halliburton Pinnacle and Arklatex); hired Josh Tema away from Ma-Tex; and continued to solicit recertification business from Halliburton and Schlumberger, two of Ma-Tex's largest customers.
77. After the Court issued its Temporary Restraining Order, API and Orbison continued to solicit wireline recertification business from Halliburton, one of Ma-Tex's largest customers, and also sought to collect payment for the two recertification jobs API had already performed for Halliburton Pinnacle and Arklatex.
78. Between April 11, 2016 and August 12, 2016, Ma-Tex paid Orbison $18,661.50.
....
80. Orbison's first two payroll checks from API, which included the period of August 15, 2016-August 31, 2016, totaled $2,307.68.

"Wireline" is a cabling technology used in the oil and gas industry for moving tools and equipment up and down a well shaft. Steve Drew, vice president for Ma-Tex, testified that wireline trucks provide a number of different services at a well location "including logging, perforation, [and] testing of the well."

Appellants also assert that Ma-Tex failed to plead lost profit damages. However, in Ma-Tex's second amended petition, Ma-Tex alleged that it "[had] suffered, and [would] continue to suffer ... lost customers, goodwill, and profits." In its prayer, Ma-Tex asked for both actual and exemplary damages. This was sufficient to place Appellants on notice that Ma-Tex was seeking damages for lost profits. See Horizon/CMS Healthcare Corp. v. Auld , 34 S.W.3d 887, 896-97 (Tex. 2000). As Ma-Tex points out, API conceded in its motion for summary judgment in the trial court that Ma-Tex was seeking lost profits in all of its causes of action.

The trial court entered a large number of unchallenged findings of fact, which are supported by the evidence. See In re E.R.C. , 496 S.W.3d 270, 288 (Tex. App.-Texarkana 2016, pet. denied) ("Unchallenged findings of fact are binding unless there is no evidence to support the finding or the contrary is established as a matter of law.") (quoting McElwrath v. McElwrath , No. 03-14-00487-CV, 2016 WL 1566624, at *1 (Tex. App.-Austin Apr. 13, 2016, no pet.) (mem. op.) (citing McGalliard v. Kuhlmann , 722 S.W.2d 694, 696 (Tex. 1986) ) ). We list many of those findings in an Appendix to this Opinion.

"When the appellate record includes the reporter's and clerk's records, ... the trial court's findings, express or implied, are not conclusive and may be challenged on appeal for evidentiary sufficiency." E.R.C. , 496 S.W.3d at 283 (quoting Lopez v. Rendsland , No. 03-10-00084-CV, 2010 WL 4053787, at *5 (Tex. App.-Austin Oct. 12, 2010, no pet.) (mem. op.) (citing Sixth RMA Partners v. Sibley , 111 S.W.3d 46, 52 (Tex. 2003) ) ).

Ma-Tex offered Matthews as a lay witness. Appellants do not challenge Matthews' competency to testify as to lost profits.

Ma-Tex also argues that Matthews was competent to testify as to good will damages and that there was ample evidence that it suffered damage to its good will. As we read Appellants' brief, it only challenges the sufficiency of the evidence supporting the amount of damages found by the trial court.

The damages under both of these theories of recovery consisted of $1,866.15, being a portion of the compensation paid to Orbison by Ma-Tex, and $2,307.68, being equal to the amount of salary paid to Orbison by API from August 15, 2016 to August 31, 2016.

The trial court found that Orbison's misappropriation of Ma-Tex's trade secrets was willful.

Appellants also challenge the legal and factual sufficiency of the evidence supporting the trial court's finding that Orbison spent 10% of his working time between April 11, 2016, and August 12, 2016, assisting API in setting up its recertification division. They argue that, since the trial court forfeited 10% of the salary Orbison received during this time, the lack of evidence as to how much time he spent assisting API should defeat the forfeiture. However, "the remedy of forfeiture must fit the circumstances presented." Swinnea , 318 S.W.3d at 874 (quoting Burrow , 997 S.W.2d at 241 ). Factors to be considered in whether to impose a forfeiture remedy, and its amount, include: "[t]he gravity and timing of the breach of duty, the level of intent or fault, whether the principal received any benefit from the fiduciary despite the breach, the centrality of the breach to the scope of the fiduciary relationship, ... any threatened or actual harm to the principal, .... [and] the adequacy of other remedies." Id. at 875. In this case, the unchallenged findings of the trial court show that Orbison's breach involved the misappropriation of Ma-Tex's trade secrets, the use of confidential information to solicit Ma-Tex's customer, the solicitation of two other employees who were key to its recertification division, and the assistance to API in setting up its recertification shop. They also show that Orbison actively sought to assist API to compete with Ma-Tex for four months before he left Ma-Tex's employ. These findings show that the trial court appropriately considered the factors set forth in Swinnea in fashioning the amount of the forfeiture and did not base the amount solely on the finding challenged by Appellants.

Appellants also challenge the basis for the permanent injunction and API being prohibited from interfering with the employment agreement. However, their sole argument in support of these complaints is that, since Orbison terminated the employment agreement, he was no longer bound by its post-employment restrictions. For the reasons stated in section (6), below, we find that Appellants failed to preserve this argument. In addition, as discussed above, the trial court made unchallenged findings that Orbison and API misappropriated Ma-Tex's trade secrets and that Orbison breached its fiduciary duties to Ma-Tex by soliciting Ma-Tex's customers and disclosing and using Ma-Tex's confidential information and trade secrets. The trial court also made an unchallenged finding that, without the permanent injunction, Ma-Tex would suffer imminent harm and irreparable injury in the form of lost profits, customers, and good will. These provide an additional basis for the permanent injunction. See Braxton v. Chin Tuo Chen , No. 06-10-00134-CV, 2011 WL 4031171, at *10 n.6 (Tex. App.-Texarkana Sept. 13, 2011, pet. denied) (mem. op.).

Appellants also complain that the injunction prohibits API from disclosing or using Ma-Tex's trade secrets and confidential information, contending that no trade secrets were presented at trial and that there was no evidence that API ever used any Ma-Tex trade secrets. The evidence and findings of fact previously discussed belie the contention that no trade secrets were presented at trial. Further, unchallenged findings numbered 61-66, set out in the Appendix to this opinion, show API used Ma-Tex's trade secrets.

Appellants do not challenge the geographical breadth or the temporal scope of the injunction.

Rule 13 and Section 10.001 only provide for the filing of a motion for sanctions as a remedy for filing pleadings in bad faith and do not create a cause of action for bad faith. Guidry v. Envtl. Procedures, Inc. , 388 S.W.3d 845, 860 (Tex. App.-Houston [14th Dist.] 2012, pet. denied) ; Trussell Ins. Servs., Inc. v. Image Solutions, Inc ., No. 12-09-00390-CV, 2010 WL 5031100, at *2-3 (Tex. App.-Tyler Dec. 8, 2010, no pet.) (mem. op.); Mantri v. Bergman , 153 S.W.3d 715, 717 (Tex. App.-Dallas 2005, pet. denied). When filed as a counterclaim for bad faith, the pleading is treated as a motion for sanctions. Guidry , 388 S.W.3d at 860 ; Trussell Ins. Servs., Inc. , 2010 WL 5031100, at *2.

The Appellants did not object at trial, nor do they complain on appeal, to Ma-Tex's failure to allocate its attorney fees between its breach of contract and misappropriation of trade secrets claims.

Appellants also incorporated the arguments contained in their trial brief on attorney fees, which only addressed the necessity of segregating the amount of attorney fees related to claims for which attorney fees are not recoverable.

See Tex. Civ. Prac. & Rem. Code Ann. § 134A.005(3) (West Supp. 2017) (providing that the trial court may award attorney fees to the prevailing party in a misappropriation of trade secrets claim if the misappropriation is "willful and malicious").

Since the trial court made one award of attorney fees for both the breach of contract and misappropriation of trade secrets claims, and Appellants do not complain about the lack of segregation between these claims, we need not address their complaints related to the award of attorney fees for breach of contract.

Requests for disclosures include "the amount and any method of calculating economic damages." Tex. R. Civ. P. 194.2(d).

Although it appears that Orbison also served requests for disclosures, they do not appear in the record.

In their reply brief, Appellants argue that we "could have incorporated" Rule 193.6(c) in two of our recent opinions, but chose not to do so, citing Hydrogeo, LLC v. Quitman Indep. Sch. Dist. , 483 S.W.3d 51, 56 (Tex. App.-Texarkana 2016, no pet.), and Good v. Baker , 339 S.W.3d 260 (Tex. App.-Texarkana 2011, pet. denied). However, neither of these cases involved the offer, and refusal, of a continuance to remedy the untimely discovery responses. Appellants also argue that putting the burden on them to accept a continuance would be unfair considering they dutifully sought the discovery that Ma-Tex withheld until the last hour and that they should not have to bear the additional costs involved in conducting additional discovery. However, Appellants never made these arguments to the trial court, nor did they request the trial court to require Ma-Tex to bear Appellants' costs associated with any additional discovery that would result from Ma-Tex's untimely disclosures. See Tinsley , 998 S.W.2d at 672 (citing Alvarado , 830 S.W.2d at 915-16 ) (When a party fails to timely "identify evidence in response to a discovery request, the trial court may impose sanctions on the offending party for abuse of the discovery process."); see also Tex. R. Civ. P. 215.3.

The only case cited by Appellants in support of their argument is Ostrowski v. Ivanhoe Prop. Owners Improvement Ass'n, Inc. , 38 S.W.3d 248 (Tex. App.-Texarkana 2001, pet. denied). However, Ostrowski does not involve the presence or absence of a saving clause and lends no support to Appellants' argument.

Orbison sent Ma-Tex a notice that he was terminating the employment agreement on March 13, 2017, over seven months after his employment was terminated and this suit was filed.