# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00609-CV

**Neurodiagnostic Consultants, LLC d/b/a Synaptic Resources of Austin, LLC, a Texas Limited Liability Company, Appellant**

**v.**

**Melody Nallia, an individual; Corey Villalobos, an individual; Bryan Bouillion, an individual; Lee Cobb, an individual; Traxx Medical Holdings, LLC, a Delaware Limited Liability Company; Traxx Blue, LLC, a Delaware Limited Liability Company; Traxx Connected, LLC, a Delaware Limited Liability Company; and Traxx Federated, LLC, a Delaware Limited Liability Company, Appellees**

---

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-004422, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Neurodiagnostic Consultants, LLC d/b/a Synaptic Resources of Austin, LLC (Synaptic) appeals from the trial court's order granting the appellees' motion to dismiss pursuant to the Texas Citizens Participation Act. *See* Tex. Civ. Prac. & Rem. Code § 27.003. Because we conclude that Synaptic met its burden under the Act to demonstrate by clear and specific evidence a prima facie case for each essential element of its claims, we reverse the trial court's judgment and remand the cause for further proceedings.

**BACKGROUND**

*Factual and Procedural History*

Synaptic is a business that provides intraoperative neurophysiological monitoring (IONM) services to hospitals, clinics, and surgeons in and around Waco, Austin, San Marcos, and San Antonio.[1] To provide these services, Synaptic employs IONM technologists. All technologists hired by Synaptic are trained to use Synaptic's monitoring equipment and are required to complete six to eight weeks of in-house training using a course program developed by Synaptic. Synaptic also requires that its technologists work toward obtaining their Certification for Neurophysiological Monitoring (CNIM), which requires the completion of additional coursework and the passing of an examination. The duties of Synaptic technologists include setting up and operating Synaptic's monitoring equipment, interviewing patients prior to surgery, connecting patients to Synaptic's monitoring equipment, consulting with surgeons, and monitoring the neurophysiological status of patients throughout surgery.

In September 2008, Synaptic hired Melody Nallia as a technologist and in 2012 promoted her to Area Manager. According to Synaptic, in her role as manager, Nallia was "one of Synaptic's primary operatives in all of Texas for retaining current clients and obtaining new ones." In January 2015, Synaptic hired Corey Villalobos as a technologist and, in January 2016, promoted him to Field Manager. During his tenure at Synaptic, Villalobos's direct supervisor was Nallia. Villalobos left Synaptic in September 2016, and Nallia left Synaptic in April 2017. Upon leaving, both Nallia and Villalobos immediately began working for Traxx, a competitor of Synaptic.

---

[1] According to Synaptic, IONM is the monitoring of the integrity of a patient's nervous system during surgery.

Synaptic later filed suit against Nallia and Villalobos, along with Traxx[2] and Traxx officers Bryan Bouillion and Lee Cobb (collectively, the Defendants) for a variety of claims arising from Nallia's and Villalobos's former employment with Synaptic and from their relationship and subsequent employment with Traxx. In general, Synaptic alleges that Bouillion and Cobb formed Traxx to compete with Synaptic in the Austin IONM market and solicited Nallia and Villalobos to help Traxx launch its business. Beginning in June 2016, while still employed with Synaptic, both Nallia and Villalobos began communicating with Bouillon and Cobb and, in Synaptic's view, actively engaging in efforts that benefitted Traxx and caused harm to Synaptic.

On June 7, 2018, the Defendants filed a motion to dismiss pursuant to Chapter 27 of the Texas Civil Practice and Remedies Code, also known at the Texas Citizens Participation Act (the TCPA). *See id.* §§ 27.001-.011. In their motion, the Defendants argued that all of Synaptic's claims fell within the scope of the TCPA and that Synaptic could not meet its burden under the TCPA of establishing a prima facie case for each essential element of its claims. *See id.* §§ 27.003, .005. In its response to the motion, Synaptic asserted that the TCPA motion should be denied because it had established a prima facie case for each of its claims with clear and specific evidence. In support of its response, Synaptic provided the trial court with:

· an affidavit from Steve Thomas, the Manager of Synaptic Resources of Austin;

---

[2] Synaptic sued Traxx Medical Holdings, LLC; Traxx Blue, LLC; Traxx Connected, LLC; and Traxx Federated, LLC. For simplicity, we will refer to these business entity defendants, collectively, as "Traxx." We will refer to Bouillion, Cobb, and Traxx, collectively, as "the Traxx Defendants."

· a copy of Nallia's employment agreement with Synaptic;

· a copy of Villalobos's employment agreement with Synaptic;

· a reporter's record, including exhibits, from a temporary-injunction hearing conducted earlier in the case;

· a copy of Synaptic's original petition and application for injunctive relief;

· a copy of Synaptic's first amended petition and application for injunctive relief;

· a text string between Bouillion and Nallia;

· an e-mail, dated February 22, 2018, from the Defendants' counsel's paralegal, stating that documents responsive to Synaptic's discovery request were attached and were bates-labeled D0001-0104;

· a text string between Villalobos and Nallia;

· an e-mail exchange between Bouillon and Nallia, from August 2016;

· an e-mail from Nallia to Bouillion, dated August 19, 2016;

· an e-mail from Nallia to Bouillion, dated August 19, 2016, with attached resume and employment application from Lauren Baker;

· an e-mail from Lauren Baker to Synaptic, dated August 19, 2016;

· a text string between Nallia and Cobb;

· an e-mail exchange between Nallia and Cobb, dated September 12, 2016;

· a portion of a transcript of Villalobos's testimony from a hearing in a suit filed by Synaptic in Bexar County against Villalobos, cause number 2017-CI-16541;

· a copy of a temporary-injunction order from the Bexar County suit; and

· an e-mail dated June 24, 2016, from Nallia to Bouillion with a copy of Nallia's employment agreement attached.

Without specifying the reason for its ruling, the trial court granted the Defendants' motion and dismissed all of Synaptic's claims. Synaptic perfected its appeal in this Court.

4

*Texas Citizens Participation Act*

The Texas Legislature passed the TCPA to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." *Id.* § 27.002. "To effectuate the statute's purpose, the Legislature has provided a two-step procedure to expedite the dismissal of claims brought to intimidate or to silence a defendant's exercise of these First Amendment rights." *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017). A party seeking to invoke the protection of the TCPA initiates this procedure by filing a motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code §§ 27.003 ("Motion to Dismiss"), .005 ("Ruling").

Under the first step, the movant bears the initial burden of showing that the TCPA applies to the nonmovant's legal action. That is, the movant must show by a preponderance of the evidence that the "legal action is based on, relates to, or is in response to" the movant's exercise "of (1) the right of free speech; (2) the right to petition; or (3) the right of association." *Id.* § 27.005(b). Under the second step, if the trial court determines that the movant has met his burden to show that the TCPA applies, the burden shifts to the nonmovant to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). If the nonmovant fails to present sufficient evidence of a prima facie case, the trial court must dismiss the action within the TCPA's expedited time frame. *See id.* § 27.005(c)-(d). However, even if the nonmovant satisfies his burden of establishing a prima facie case, the movant may still obtain dismissal by establishing "by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." *Id.* § 27.005(d).

5

We review trial court's ruling on a motion to dismiss under the TCPA under a de novo standard of review. *Serafine v. Blunt*, 466 S.W.3d 352, 357 (Tex. App.—Austin 2015, no pet.); *Campbell v. Clark*, 471 S.W.3d 615, 623 (Tex. App.—Dallas 2015, no pet.). Accordingly, we consider de novo the trial court's determinations of whether the movant has established by a preponderance of the evidence that the TCPA applies to the challenged claim and whether the nonmovant has presented clear and specific evidence establishing a prima facie case for each essential element of the challenged claim. *Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 797 (Tex. App.—Austin 2017, pet. granted).

## ANALYSIS

In this case, Synaptic does not challenge the trial court's determination that the TCPA applies to its claims. Instead, Synaptic's sole complaint on appeal is that the trial court erred in granting the Defendants' TCPA motion and in dismissing its claims because, according to Synaptic, it satisfied its burden under the second step of the TCPA to present clear and specific evidence establishing a prima facie case for each essential element of the claims at issue and because the Defendants did not establish a valid defense. *See* Tex. Civ. Prac. & Rem. Code § 27.005(b), (d).

The term "clear and specific evidence" "refers to the quality of evidence required to establish a prima facie case." *Serafine*, 466 S.W.3d at 358. Because the TCPA does not define "clear and specific evidence," we give those terms their ordinary meaning: "clear" meaning "unambiguous, sure, or free from doubt," and "specific" meaning "explicit or relating to a particular named thing." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (orig. proceeding). In this context, "evidence" includes "the pleadings and supporting and opposing affidavits stating

6

the facts on which the liability or defense is based." Tex. Civ. Prac. & Rem. Code § 27.006(a); *Serafine*, 466 S.W.3d at 360 (noting that under TCPA, "the trial court may consider pleadings as evidence").

In *Lipsky*, the Texas Supreme Court expressly rejected the notion that the "clear and specific evidence" standard imposes a heightened evidentiary standard. *See* 460 S.W.3d at 590-91. In addition, the nonmovant plaintiff may satisfy its burden using circumstantial evidence. *Id.* Circumstantial evidence is "indirect evidence that creates an inference to establish a central fact," and some factual determinations, such as state of mind, may depend exclusively on circumstantial evidence. *Warner Bros. Entm't*, 538 S.W.3d at 799 (citing *Lipsky*, 460 S.W.3d at 589; *Bentley v. Bunton*, 94 S.W.3d 561, 596 (Tex. 2002) (noting that claims involving state of mind must usually be established by circumstantial evidence)). The Act does, however, require more than "mere notice pleading," and general allegations that merely recite the elements of a cause of action will not be sufficient to establish a prima facie case. *Lipsky*, 460 S.W.3d at 590. Instead, a plaintiff must "provide enough detail to show the factual basis for its claim." *Cavin v. Abbott*, 545 S.W.3d 47, 72 (Tex. App.—Austin 2017, no pet.) (quoting *Lipsky*, 460 S.W.3d at 591).

A prima facie case "refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Lipsky*, 460 S.W.3d at 590. "It is the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Id.* (quoting *In re E.I. DuPont de Nemours & Co.,* 136 S.W.3d 218, 223 (Tex. 2004) (per curiam)). When determining if the nonmovant has met his burden, the court views all of the "evidence" in the light most favorable to the nonmovant. *Warner Bros. Entm't*, 538 S.W.3d at 801. If the nonmovant provides evidence that establishes a prima facie case if left uncontradicted and

7

unexplained, the prima facie case is rebutted only when the true facts are conclusively shown by other evidence. *Id.*

With these principles in mind, we will evaluate the pleadings and evidence in this case. *See* Tex. Civ. Prac. & Rem. Code § 27.006(a) ("In determining whether a legal action should be dismissed under this chapter, the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based.").

### *Synaptic's Allegations and Evidence*

Synaptic alleges in its live pleadings that it employed Nallia and Villalobos to perform IONM services in Waco, Austin, and San Antonio for surgeons in these cities and surrounding areas who had selected Synaptic as their IONM service provider. Nallia and Villalobos were originally employed as technologists but were later promoted to managerial positions with Synaptic. Specifically, Nallia was promoted to Area Manager, and Villalobos was promoted to Field Manager in the same area. As managers, Synaptic provided Nallia and Villalobos with information that Synaptic considered to be highly confidential and proprietary, such as pricing information from Synaptic's contracts and agreements with each of its hospital and facility clients.[3] According to Synaptic, it independently negotiates its pricing with each medical facility. Nallia and Villalobos were also provided with the terms of Synaptic's employment agreements with other employees, Synaptic's technologist's field manual, Synaptic's policy and procedure manual, and its proprietary business strategy to effectively reduce costs and increase profit. During their employment, Nallia and Villalobos also learned of the personal preferences

---

[3] Although Synaptic contracts and has agreements with the hospitals, it is most often the individual surgeon with whom Synaptic has developed a relationship who will exercise his or her discretion to select Synaptic as the preferred IONM vendor.

8

of individual surgeons developed by Synaptic for case coverage and had access to Synaptic's proprietary programs utilizing surgeon preferences for customer-client satisfaction and business development purposes. Nallia and Villalobos obtained Synaptic's client feedback and participated in using Synaptic's collected information to improve services and further develop business strategies for Synaptic. Finally, Nallia and Villalobos were familiar with Synaptic's developed training program and software, as well as continuing education requirements.

Synaptic alleges that it learned soon after Nallia and Villalobos left Synaptic that Nallia and Villalobos had "engaged in efforts to benefit Traxx, an IONM company that competes directly with Synaptic, long before either's employment with Synaptic ended." Although Traxx was not legally formed until August 2016, Nallia had developed a professional relationship with Bouillion beginning in 2014, and in 2015 Nallia informed Bouillion that she wanted to leave Synaptic. Evidence submitted by Synaptic in response to the Defendants' motion shows that in June 2016, while still employed as an Area Manager at Synaptic, Nallia began communicating with Bouillion and his business partner, Cobb, about creating and operating Traxx as well as helping Traxx enter into the IONM business. Nallia arranged for Villalobos, also employed by Synaptic at the time, to meet with Bouillion about job opportunities at Traxx. Following a lunch meeting between Bouillion, Nallia, and Villalobos on June 24, 2016, Nallia texted Bouillion that she and Villalobos were "really excited about the opportunity and hope everything works out. Let me know if you have any further questions and I will be happy to help." Nallia also forwarded to Bouillion a copy of her employment agreement with Synaptic. Bouillion responded by stating that he was going to "maneuver around" Nallia's and Villalobos's employment agreements with Synaptic and, the next month, asked Nallia what cities she and Villalobos would be willing to move to "for non-compete reasons." In text messages to Nallia, Villalobos referred

9

to Traxx as his company, stated that he wanted to be one to "start" Traxx, and suggested that Synaptic might not actually sue to enforce their employment agreements. When Villalobos suggested that Traxx could "buy [their] way out" of the non-compete, Nallia responded, "Yeah, I mentioned it and [Bouillion] made it seem like we wouldn't need to do that necessarily. I also told him you would be willing to sneak around."

Synaptic alleges that after the June 24, 2016 lunch meeting, Nallia and Villalobos began providing Bouillion and Cobb with confidential information belonging to Synaptic that would help Traxx compete directly with Synaptic. According to Synaptic's pleadings, Nallia assisted Traxx in identifying technologists who had previously worked at Synaptic and whom Traxx could potentially hire, advised Bouillion about the technology and equipment that Traxx would need to compete in the IONM market, and provided Bouillion and Cobb with customer pricing information that Traxx could then use to acquire customers from Synaptic. For example, in July 2016, Nallia informed Bouillion in a text that one of Synaptic's interpreting physicians, Dr. Yanko Yankov, was being paid $150 per case but was unhappy with this compensation arrangement with Synaptic and wanted to be paid $250 per case. Nallia informed Bouillion that Synaptic was not willing to pay Dr. Yankov more money, that Dr. Yankov likely would be willing to work with Traxx, and that she could provide all of his contact information.[4] Bouillion responded, "Cool . . . We will pay 200-250. Please send me his info." The next month, Dr. Yankov terminated his relationship with Synaptic.

---

[4]  In his affidavit, Steve Thomas, manager of Synaptic Resources Austin, LLC, states that "Synaptic does not permit its interpreting physicians to provide services to other IONM companies while under contract with Synaptic," and that "[a]s of July 26, 2016, Dr. Yankov had an exclusive business relationship with Synaptic as an interpreting physician."

On June 28, 2016, Bouillion e-mailed Nallia to get advice on whether Traxx should purchase a type of IONM equipment called the "Caldwell Pro" or, instead, purchase a type of equipment called the "Elite." Nallia responded by telling Bouillion to purchase the "Pro," explaining that Synaptic owns an "Elite" but "hardly ever uses it." Similarly, in September 2016, Cobb e-mailed Nallia, "This is a quote for [IONM equipment] 2 16 channel. That is the machine we need? And do we need all the options on this quote? Or is there anything we can take off?" Nallia responded, "Looks right to me. You also may want to ask them about VEP goggles. I didn't see them on the list but it is very possible you may need them. They are used on pituitary tumor cases which I know [Drs.] Hummell/Tumu do."

In August 2016, Bouillion contacted Nallia by e-mail and asked for her help in deciding how to "get the best people," "get them to stay," "grow as a CNIM tech," and "progress[] towards a manager." Nallia responded with a formulated career path, which included position titles, job duties, and compensation levels for technologists and managers. That same month, Nallia forwarded information to Bouillion about a potential technologist, Lauren Baker, who had submitted her application and resume to Synaptic through the Synaptic website. Nallia told Bouillion that even though Baker had applied to Synaptic, it "shouldn't be a problem" and later informed Bouillion that Synaptic's president really wanted to hire Baker. Nallia initially planned to attend Baker's interview with Traxx, but later requested that Cobb send Villalobos in her place. In a text to Cobb, Nallia stated that she had already agreed to attend Synaptic's interview of Baker that same day, and she did not want to make Baker feel uncomfortable, presumably by seeing Nallia at interviews for two separate companies. Villalobos attended Baker's interview with Traxx in Nallia's place, and Baker eventually accepted employment with Traxx instead of Synaptic.

11

Synaptic also alleges that Nallia and Villalobos actively induced doctors and facilities to terminate their relationships with Synaptic. On August 19, 2016, eight months before leaving Synaptic, Nallia e-mailed Bouillion that she had "looked through her file and was able to get a contact for Arise," a medical facility where Synaptic IONM provided services. In the same e-mail, Nallia provided Bouillion with the name and e-mail of her purported contact at Arise. On August 24, 2016, Nallia texted Villalobos that "Bryan [Bouillion] told me [Dr.] [S]tokes is in but they are going to wait on him a bit [because] they have to get into [S]eton. He said right now they are going to start working at [A]rise and [St. David's Medical Center]." Dr. John Stokes is a customer of Synaptic for whom Nallia had performed IONM services on at least 51 surgeries. Arise, Seton, and St. David's Medical Center are medical facilities where Synaptic performed IONM. In addition, while employed at Synaptic, Nallia provided IONM services for Austin neurosurgeons Drs. Hari Tamu, Daniel Peterson, and Marcella Madera during more than 50 surgeries. After Nallia left in March 2017, those doctors stopped engaging Synaptic and began using Traxx to perform IONM services. Similarly, after Villalobos left Synaptic in September 2016, he began providing IONM services for Dr. Peterson, for whom he had provided IONM services at Synaptic. Villalobos also began encouraging Nallia to leave Synaptic and come to work for Traxx, which she eventually did in April 2017.

Synaptic sued (1) Nallia and Villalobos for breach of contract; (2) Villalobos, Cobb, Bouillion, and Traxx for intentional interference with contract; (3) Nallia and Villalobos for misappropriation of trade secrets; (4) Nallia and Villalobos for breach of fiduciary duty; and (5) Bouillon, Cobb, and Traxx for inducing, assisting, and participating in Nallia's and Villalobos's breach of fiduciary duty. Synaptic also sought to hold all of the Defendants jointly liable for the alleged unlawful acts of each other under a theory of civil conspiracy.

12

***Breach of Contract and Intentional Interference with Contract***

To defeat the Defendants' motion to dismiss with respect to its breach-of-contract claims against Nallia and Villalobos, Synaptic was required to establish a prima facie case by clear and specific evidence that (1) valid contracts existed between Synaptic and Nallia and Villalobos; (2) Synaptic tendered performance or was excused from doing so; (3) Nallia and Villalobos breached the terms of their contracts; and (4) Synaptic sustained damages as a result of the breaches. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). Similarly, to establish a prima facie case on its tortious-interference-with-contract claims against Bouillion, Cobb, and Traxx, Synaptic was required to present clear and specific evidence establishing (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract (3) that proximately caused Synaptic's injury and (4) caused actual damages or loss. *See Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

The allegations in Synaptic's live pleadings and the evidence presented by Synaptic in support of its response to the motion to dismiss, show that Synaptic had valid employment agreements with Nallia and Villalobos. These agreements, copies of which were attached to Synaptic's response, were signed by Nallia and Villalobos and outlined the terms of their employment. In part, the agreements required Nallia and Villalobos, as part of their managerial duties, to "devote [their] full professional time to the performance of [their] duties" and to "not engage in any professional activities that would interfere with the performance of [their] duties." The agreements also prohibited Nallia and Villalobos, both during and after their employment, from competing with Synaptic in the IONM business; from soliciting employees, consultants, contractors, and customers of Synaptic; and, at any time, from disclosing

13

confidential information belonging to Synaptic. Synaptic tendered performance by employing Nallia and Villalobos for several years and by providing them with access to information that Synaptic considered to be confidential and proprietary. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 655 (Tex. 2006) (employee's promise not to disclose confidential information may serve as foundation for enforceable non-compete agreement when promise is accepted by employer's tendering of confidential information).

The record also establishes by clear and specific evidence that Nallia and Villalobos breached their respective employment agreements, both during and immediately after their employment with Synaptic. Synaptic's allegations and the evidence, viewed in the light most favorable to Synaptic, establish that even before their employment with Synaptic ended, Nallia and Villalobos actively assisted Traxx in its plans and preparations to enter and compete in the Austin IONM marketplace. In addition, Nallia provided information and advice to Bouillion and Cobb to assist Traxx in the IONM marketplace, and the non-disclosure provision in Nallia's employment agreement specifically defined "confidential information" as including at least some of the information that she provided. When Nallia and Villalobos left Synaptic, they immediately went to work for Traxx providing IONM services. Finally, Synaptic presented clear and specific evidence that when Bouillion and Cobb requested Nallia's and Villalobos's assistance in establishing and operating Traxx, they were aware of Nallia's and Villalobos's employment with Synaptic and with the terms of their employment agreements, including their non-competition and non-disclosure provisions. Similarly, Villalobos was aware of Nallia's employment agreement and its non-competition provision when he encouraged Nallia to leave Synaptic and work for Traxx.

14

Finally, to prevail on their claims for breach of contract and for intentional interference of contract, Synaptic must show that it has suffered actual damages or injury as a result of the Defendants' wrongful conduct. *See USAA Tex. Lloyds*, 545 S.W.3d at 501 n.21; *Prudential Ins. Co. of Am.*, 29 S.W.3d at 77. Synaptic alleges that due to the wrongful actions by Nallia and Villalobos, "Bouillion and Cobb were able to establish Traxx as a competitor and gain unfair competitive advantages over Synaptic that Traxx would not have otherwise had." According to Synaptic, it has "suffered, and continues to suffer, direct damages in the form of lost profits, business opportunities, and economic advantages." Although the Defendants do not dispute that Synaptic has established a prima facie case with respect to most of the essential elements of their claims for breach of contract and for intentional interference with contract, the Defendants contend that, as a matter of law, Synaptic cannot meet its burden on the essential element of damages or loss.

In support of their contention, the Defendants argue that Synaptic is barred by Section 15.51 of the Covenants Not to Compete Act from recovering any damages in connection with any alleged breach of the employment agreements. *See* Tex. Bus. & Com. Code §§ 15.50-.52. This provision, in relevant part, states:

> [If an otherwise enforceable covenant not to compete] contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee, the court shall reform the covenant to the extent necessary . . . and enforce the covenant as reformed, **except that the court may not award the promisee damages for a breach of the covenant before its reformation** and the relief granted to the promise shall be limited to injunctive relief.

*Id.* § 15.51(c) (emphasis added). The Defendants reason that because the non-competition covenants at issue in this case were reformed by the trial courts following temporary-injunction

hearings, Synaptic is precluded from recovering damages in connection with any alleged breach of the contractual restrictions in this case.[5] The Defendants reason that this inability to recover damages necessarily prevents Synaptic from establishing a prime facie case of contractual damage or loss.

Assuming without deciding that Section 15.51 applies to this dispute, we disagree that this statutory provision operates as a bar to Synaptic's breach-of-contract and tortious-interference-with-contract claims. First, the limitation on damages found in Section 15.51, by its express terms, would apply only to damages sought by Synaptic for breach of the employment agreements' non-competition provisions and would not prevent Synaptic from recovering damages for breach of the non-solicitation or non-disclosure provisions. Second, although a covenant not to compete may be reformed as part of an order granting a temporary injunction, as it was in this case, *see also Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 WL 1257278, at *30 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) (mem. op.) (concluding that reformation "is not only a final remedy" and may be made incidental to temporary injunctive relief), Section 15.51 applies only when the issue of enforceability of the covenant is finally determined and reformation is made as part of a final remedy, *see Primary Health Physicians, P.A. v. Sarver*, 390 S.W.3d 662, 665 (Tex. App.—Dallas 2012, no pet.) (collecting cases holding that Act

---

[5] Originally, Synaptic filed suit against Nallia in Travis County in August 2017, claiming that she breached the non-compete and non-solicitation provisions in her employment agreement, and sought enforcement through a temporary injunction. In November 2017, the trial court signed an order reforming the non-compete provision and, as reformed, temporarily enjoining Nallia from soliciting physicians and hospitals within a fifty-mile radius of Austin. Synaptic also filed suit against Villalobos in Bexar County. In October 2017, following a temporary-injunction hearing, the Bexar County trial court reformed the non-compete provision to prevent Villalobos from working with or "deal[ing] in any way with surgeons with whom he worked with while employed with Synaptic."

does not preempt requirements for temporary injunctive relief and concluding Act governs only final remedies).

In the alternative, the Defendants broadly assert that the trial court's dismissal of *all* of Synaptic's claims—including but not limited to its claims for breach of contract and for intentional interference with contract—was proper because Synaptic failed to meet its burden to present clear and convincing evidence that the Defendants' allegedly wrongful conduct caused Synaptic to sustain any actual damages or loss. Because damages or injury is an element common to all of Synaptic's claims, we will reserve discussion regarding this argument for the conclusion of our analysis.

*Misappropriation of Trade Secrets*

To prove an action for misappropriation of trade secrets, a plaintiff must establish (1) the existence of a trade secret; (2) acquisition of the trade secret through a confidential relationship or discovery of it by improper means; (3) use of the trade secret without authorization; and (4) resulting damages to the plaintiff. *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied); *see* Tex. Civ. Prac. & Rem. Code §§ 134A.003-.004. In 2013, the Legislature adopted the Texas Uniform Trade Secrets Act, which defines "trade secret" as

> all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

17

(A)   the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B)   the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Tex. Civ. Prac. & Rem. Code § 134A.006(2).

In this case, Synaptic's allegations and evidence show that Synaptic possessed information generally considered to be the kind of information entitled to protection as trade secrets, including negotiated pricing with its customers, customer contact information, customer preferences, marketing strategy, and strategic business plans. *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (trade secrets may include customer lists, customer contact information, pricing information, and market strategies); *Trilogy Software*, 143 S.W.3d at 466 (recognizing that "information that a firm compiles regarding its customers may enjoy trade secret status under Texas law"). Synaptic sought to keep the information confidential by having management-level employees, such as Nallia and Villalobos, sign non-disclosure agreements before being given access to the information. *See Trilogy Software*, 143 S.W.3d at 467 ("Before information can be a 'trade secret,' there must be a substantial element of secrecy."). The evidence consequently shows that Synaptic disclosed the trade secrets to Villalobos and Nallia in confidence, and only in furtherance of Synaptic's business, and that Nallia then disclosed the information to Bouillion and Cobb for use in a competing business. *See Global Water Grp., Inc. v. Atchley*, 244 S.W.3d 924, 930 (Tex. App.—Dallas 2008, pet. denied) ("Actual use or disclosure of the trade secret is a required element of the tort. Use of the trade secret means commercial use by which the offending party seeks to profit from the use of the secret."). Finally, the totality of the evidence—including evidence that

18

Traxx launched into the IONM market after acquiring the confidential information—supports a rational inference that the Traxx Defendants actually used the information to obtain a competitive advantage. *See id.* (concluding that evidence of similar formula was sufficient to support inference that trade secret was used).

Considering all the evidence and viewing it in the light most favorable to Synaptic, we conclude that Synaptic satisfied its burden to present a prima facie case of misappropriation of trade secrets as to Nallia, assuming that it has presented clear and specific evidence of damages or loss. As previously discussed, the Defendants challenge Synaptic's prima facie case as to the element of damages, which we will discuss later. We also conclude, however, that there are insufficient factual allegations and evidence suggesting that Villalobos disclosed trade secrets to the Traxx defendants. Consequently, Synaptic has failed to present a prima facie case of misappropriation of trade secrets as to Villalobos directly. Absent a showing of a conspiracy, which we will discuss later, Villalobos cannot be liable on this claim.

### *Breach of Fiduciary Duty*

To prove a claim for breach of fiduciary duty, a plaintiff must prove that a fiduciary duty exists, that it was breached, and that the breach proximately caused damages. *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The term "fiduciary" generally applies "to any person who occupies a position of peculiar confidence towards another," refers to "integrity and fidelity," and contemplates "fair dealing and good faith." *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 185 (Tex. App.—Houston [1st Dist.] 2005, no pet.). In Texas, an employee may owe a limited fiduciary duty to his or her employer. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201 (Tex. 2002);

19

*Orbison v. Ma-Tex Rope Co.*, 553 S.W.3d 17, 30 (Tex. App.—Texarkana 2018, pet. denied). When a fiduciary relationship exists between an employee and his employer, the employee has a duty to act primarily for the benefit of his employer in matters connected with his employment.[6] *Wooters v. Unitech Int'l, Inc.*, 513 S.W.3d 754, 762-63 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). As a result, an employee may not (1) appropriate the company's trade secrets; (2) solicit the former employer's customers while still working for his employer; (3) solicit the departure of other employees while still working for his employer; or (4) carry away confidential information. *Id.* (citing *Abetter Trucking Co.*, 113 S.W.3d at 512).

Synaptic contends, and we agree, that the express terms of the employment agreements make clear that, as managers, Nallia and Villalobos were placed in positions of confidence and trust. Consequently, Synaptic met its burden to present clear and specific evidence of the existence of a fiduciary relationship.

We also conclude that Synaptic met its burden to establish a prima facie case of breach of fiduciary duty. In part, Synaptic claims that Nallia and Villalobos breached their fiduciary obligations by "actively soliciting and diverting employees, potential employees, potential customers, and business opportunities to Traxx" while still employed at Synaptic. We agree that Synaptic's factual allegations and responsive evidence are sufficient to support this claim of breach. For example, the record suggests that in her managerial position at Traxx,

---

[6] An employee does not owe his employer an absolute duty of loyalty, however, and an employee's duty to his employer is "tempered by society's legitimate interest in encouraging competition." *Wooters v. Unitech Int'l, Inc.*, 513 S.W.3d 754, 762-63 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (quoting *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201 (Tex. 2002)). Thus, in the absence of an enforceable non-competition agreement, an at-will employee may "properly plan to go into competition with his employer and may take active steps to do so while still employed." *Johnson*, 73 S.W.3d at 201 (quoting *Augat, Inc. v. Aegis, Inc.*, 565 N.E.2d 415 (Mass. 1991)). Synaptic does not and cannot claim that Nallia and Villalobos breached a fiduciary duty by merely planning and taking active steps to compete with Synaptic.

Nallia became aware of Lauren Baker as a candidate for employment and that Nallia and Villalobos used this information to actively divert Baker to employment with Traxx.

Synaptic also claims that Nallia and Villalobos breached their fiduciary duties by providing Bouillion, Cobb, and Traxx with "confidential information in order to provide Traxx with unfair competition and advantages over Synaptic." This claim of breach of fiduciary duty overlaps factually with Synaptic's claims for misappropriation of trade secrets and for breach of the employment agreements' non-disclosure provision. For the same reasons we concluded that Synaptic presented a prima facie case of wrongdoing as to those claims against Nallia, we conclude that Synaptic presented a prima facie case of breach of fiduciary duty based on the disclosure of confidential information against Nallia. As previously discussed, we will reserve our discussion of damages for the conclusion of our analysis.

*Conspiracy*

To prove an action for civil conspiracy, a plaintiff must establish five elements: "(1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017). Civil conspiracy is considered a "derivative tort," meaning "a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Warner Bros. Entm't*, 538 S.W.3d at 813-14 (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (orig. proceeding)).

21

Viewing all the evidence in the light most favorable to Synaptic, we conclude that a factfinder could reasonably infer from the circumstances that the Defendants had a "meeting of the minds on the object or course of action." *See Wooters*, 513 S.W.3d at 761 (explaining that "[f]or conspiracy claims, the proof is often based on circumstantial evidence"; in reviewing circumstantial evidence, courts "review the totality of the known circumstances"; and "[a] conspiracy finding depends on the reasonableness of the inferences drawn from these circumstances"). Synaptic's factual allegations and evidence show that Nallia, Villalobos, and the Traxx Defendants sought to launch a business providing IONM services in the Austin area, in competition with Synaptic. The evidence and allegations also suggest that to accomplish this objective, the Traxx Defendants sought, and Nallia disclosed, confidential information belonging to Synaptic, at least some of which is entitled to trade-secret protection. In addition, the Traxx Defendants obtained the assistance of Villalobos, knowing his assistance and eventual employment would violate his obligations under his employment agreement with Synaptic. Synaptic established, by clear and specific evidence, a prima facie case for its derivative claim of conspiracy. Consequently, Synaptic can maintain its tort claims against all the Defendants, including its claim of misappropriation of trade secrets against Villalobos.

### *Damages*

Finally, we consider whether Synaptic established by clear and specific evidence a prima facie case of the element of actual damages or loss. Although a bare recitation of the type of damages sought is insufficient to establish a prima facie case under the TCPA, Synaptic was not required to show a specific amount of damages, *see Lipsky*, 460 S.W.3d at 593-95, or to adduce all of the evidence that it would, or could, need at trial, *see Deuell v. Texas Right to Life*

22

*Comm., Inc.*, 508 S.W.3d 679, 688-89 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Instead, to meet its burden, Synaptic was required only to adduce evidence or allege facts sufficient to support a rational inference "that some damages naturally flowed from the [Defendants'] conduct." *See S&S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018) (citing *Lipsky*, 460 S.W.3d at 591); *Deuell*, 508 S.W.3d at 689.

Upon review of the allegations and evidence in this case, we conclude that Synaptic met its burden of establishing by clear and specific evidence a prima facie case that it suffered actual damages or loss as a result of the Defendants' allegedly wrongful actions. As previously discussed, Synaptic alleged and presented evidence that during Nallia's employment with Synaptic, she provided IONM services for Drs. Hari Tamu, Daniel Peterson, and Marcella Madera, neurosurgeons in Austin, in over 50 surgeries. After Nallia left in March 2017, these doctors stopped engaging Synaptic and began using Traxx to perform IONM services. Similarly, Synaptic presented evidence that after Nallia disclosed to Bouillion how much Synaptic was paying its interpreting physician, Dr. Yankov, Traxx was able to use that information to hire Dr. Yankov away from Synaptic. In his affidavit, Synaptic manager Steve Thomas states that Synaptic has not been able to replace Dr. Yankov since he left. Finally, with respect to Nallia's solicitation of Lauren Baker, Thomas states that Synaptic "desired to hire Baker, but was unable to do so because Baker accepted employment with Traxx. . . . Synaptic still has not been able to hire a new Technologist with a CNIM." From the totality of the circumstantial evidence presented, we conclude that a factfinder could reasonably infer that the actions of the Defendants, including the disclosure of Synaptic's confidential information and trade secrets, caused Synaptic to lose customers, existing business relationships, and potential employees. Based on Synaptic's pleadings and the evidence, viewed in the light most favorable to Synaptic, we conclude that

23

Synaptic presented a prima facie case that it suffered economic injury as a result of the Defendants' wrongful conduct. *See Warner Bros. Entm't*, 538 S.W.3d at 801.

The Defendants contend that the trial court did not err in dismissing Synaptic's claims because Synaptic failed to present clear and specific evidence of damages or loss. Specifically, the Defendants assert that Synaptic did not meet its burden under the TCPA because it "failed to produce any evidence that a customer would have done business with Synaptic, or that any employee or prospective employee would have continued or accepted employment with Synaptic absent any alleged misconduct." In support of their argument, the Defendants rely on affidavits that they submitted to the trial court as a "supplemental submission of evidence" in support of their joint motion to dismiss. In effect, the Defendants assert that any prima facie case of damages established by Synaptic has been effectively rebutted by affidavit evidence that conclusively establishes that Synaptic has not, in fact, suffered any injury or damage as a result of any wrongdoing by the Defendants. *See id*.

First, the Defendants point to affidavits from Drs. Hari Tamu, Daniel Peterson, and Marcella Madera. In their affidavits, both Dr. Madera and Dr. Tamu state that they stopped using Synaptic as their IONM service provider and started using Traxx due to their dissatisfaction with Synaptic's services and not due to "anything [Nallia or Villalobos] said or did." Similarly, Dr. Peterson states in his affidavit that he stopped using Synaptic and started using Traxx for IONM services because of his long-standing friendship with Bouillion. The Defendants reason that this evidence conclusively establishes that Synaptic did not lose the business of these three doctors due to any action by Nallia or Villalobos and that Synaptic did not present any other evidence of damages. Second, with respect to Dr. Yankov, the Defendants point to Cobb's affidavit and, more specifically, to Cobb's statement that Dr. Yankov never worked for Traxx.

24

According to the Defendants, this statement conclusively negates Synaptic's theory that the Defendants' wrongful conduct caused Dr. Yankov to terminate his relationship with Synaptic. Finally, the Defendants assert that Synaptic was not harmed by any effort taken by the Defendants to obtain Lauren Baker as an employee because, according to Baker's affidavit, she received Synaptic's verbal offer of employment a week after she had accepted Traxx's offer and, even if Traxx had not made an employment offer, she would not have accepted Synaptic's offer. In her affidavit, Baker explains that she "did not get a good feeling from the interview and [from] other conversations with Jon Schiff of Synaptic."

"Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *City of Keller v. Wilson*, 168 S.W.3d 802, 806 (Tex. 2005). Most often, contrary evidence becomes conclusive when it concerns physical facts that cannot be denied or when an opposing party admits the fact is true. *Id*. at 815. Because jurors may believe or disbelieve witness testimony—even uncontradicted, unimpeached testimony from disinterested witnesses—testimonial evidence, often, is not conclusive. *See id.* at 816, 820. At this early stage of the proceedings, we cannot conclude that the affidavits submitted by the Defendants for the purpose of establishing the subjective motivations of the nonparty affiants must be given conclusive effect. *See Warner Bros. Entm't*, 538 S.W.3d at 801 (prima facie case can only be rebutted by conclusive evidence).

Viewing the evidence in the light most favorable to Synaptic, we conclude that Synaptic has met its burden to establish, by clear and convincing evidence, a prima facie case for its claims against Nallia, Villalobos, and the Traxx Defendants. The trial court erred in granting the motion to dismiss.

## CONCLUSION

We reverse the judgment of the trial court dismissing Synaptic's claims and remand the cause for further proceedings consistent with this opinion.

_____

Chari L. Kelly, Justice

Before Chief Justice Rose, Justices Kelly and Smith

Reversed and Remanded

Filed:   September 6, 2019